Filed 4/23/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| AJAXO, INC., | H042999 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. CV793529) |
| v. | |
| E*TRADE FINANCIAL CORPORATION, | |
| Defendant and Respondent. | |
| AJAXO, INC., | H043530 |
| Plaintiff and Appellant, | |
| v. | |
| E*TRADE GROUP, INC., | |
| Defendant and Respondent. | |

I.   FACTUAL AND PROCEDURAL BACKGROUND ..............................................2

   A.   Underlying Dispute, Jury Trial (2003) and First Appeal ...................................... 2

   B.   Jury Trial on Misappropriation Damages (2008) and Second Appeal ................... 6

   C.   Reasonable Royalty Trial (2012-2015) and Present Appeal ................................. 8

      1.   Royalty Trial, Phase I ...................................................................................... 9

      2.   Royalty Trial, Phase II .................................................................................. 14

         a. Ajaxo's Royalty Models and Koo's Expert Testimony ................................... 16

b. E*Trade's Experts Reject Imposition of Any Royalty ...................................... 19

3. Closing Briefs and E*Trade's Motion to Strike ................................................. 22

4. Trial Court's Statement of Decision ................................................................. 24

D. Ajaxo's Motion for a New Trial ............................................................................. 25

E. Ajaxo's Motion to Strike Costs ............................................................................. 26

II. DISCUSSION ................................................................................................................ 28

A. Framework to Assess a Reasonable Royalty Under the CUTSA .......................... 28

B. The Appellate Burden in a Failure-of-Proof Case ................................................. 32

C. It Was Within the Trial Court's Discretion To Deny Ajaxo a Royalty ................. 34

1. The Award of a Reasonable Royalty Pursuant to Civil Code Section 3426.3, subdivision (b) Is Discretionary ............................................................................ 34

2. Ajaxo Fails to Accurately Portray the Record Evidence ................................... 35

3. The Available Evidence Did Not Compel a Reasonable Royalty Award ........ 36

a. The Trial Court Did Not Abuse its Discretion in Deeming the Alleged Spoliation of Evidence and the Apportionment of Actual Trade Secret Value Relevant to Any Reasonable Royalty Award ...................................................... 39

b. The Trial Court Did Not Abuse its Discretion in Refusing to Assess a Royalty Based on the Available Evidence ........................................................... 46

c. The Trial Court Did Not Abuse its Discretion in Rejecting a Reasonable Royalty Based on the Value-Added Developer Distribution Model ..................... 48

d. The Trial Court Did Not Abuse its Discretion in Excluding Expert Testimony on Royalty Theories That Were Not Timely Disclosed ...................... 56

e. Summary ......................................................................................................... 62

D.   The Trial Court Did Not Err In Denying Ajaxo a New Trial ................................. 64

    a.   The Court Did Not Err in Applying the Georgia-Pacific Factors .................... 65

    b.   The Court Did Not Err by Awarding Inadequate Damages ............................ 71

    c.   Summary .......................................................................................................... 76

E.   The Trial Court Did Not Err in its Prevailing Party Determination and Costs

Award ........................................................................................................................ 76

III.   DISPOSITION ................................................................................................................. 85

A jury in 2003 found defendant E*Trade Financial Corp. (E*Trade) liable for trade secret misappropriation and for breach of a mutual nondisclosure agreement with plaintiff Ajaxo, Inc. (Ajaxo).  The jury awarded damages only on the breach of contract cause of action after the trial court granted a nonsuit on the issue of damages for trade secret misappropriation.  An appeal before this court led to a remand for a second trial on damages for the misappropriation.  The jury in that 2008 trial found no net damages for unjust enrichment and awarded nothing to Ajaxo.  The trial court then denied Ajaxo's request to seek a reasonable royalty under the California Uniform Trade Secret Act (Civ. Code, §§ 3426-3426.11 (CUTSA)).[1]  A second appeal followed, and this court reversed. We held that the trial court had the discretion to award payment of a reasonable royalty pursuant to section 3426.3, subdivision (b), which states that "[i]f neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty . . . ."  We remanded the matter for the trial court to exercise its discretion under the statute.  The trial court held a bench trial on remand to determine whether Ajaxo was entitled to a reasonable royalty and in what amount, if any.  It ultimately declined to award any royalty to Ajaxo.  It entered judgment for E*Trade and awarded E*Trade its costs as the prevailing party in the action.

On appeal, Ajaxo challenges the trial court's failure to award it a reasonable royalty for E*Trade's willful and malicious trade secret misappropriation.  Ajaxo also challenges the denial of its motion for a new trial and the award of costs in favor of E*Trade.  Among the issues raised, we decide whether the trial court abused its discretion by declining to award *any* reasonable royalty despite the available evidence from which a reasonable royalty theoretically might have been derived.  We consider the court's findings on the evidence, its application of apportionment principles from patent law, its exclusion of expert testimony and analysis of Ajaxo's royalty model, and its treatment of

_____

[1] Unspecified statutory references are to the Civil Code.

what are commonly called the "*Georgia-Pacific* factors" for determining a royalty rate in intellectual property disputes. (See *Georgia-Pacific Corp. v. United States Plywood Corp.* (S.D.N.Y. 1970) 318 F.Supp. 1116 (*Georgia-Pacific*).)

We also decide whether the trial court erred in its prevailing party determination and costs award, an issue that requires us to reconcile the meaning of a "prevailing party . . . in any action or proceeding" (Code Civ. Proc., § 1032, subd. (b)) with the practical effect of Ajaxo having already obtained full satisfaction of what became a separate, final judgment in its favor following the remittitur in 2006 from the first appeal, including costs awarded at that time.

We conclude as to the reasonable royalty that the trial court did not abuse its discretion in denying a royalty under the CUTSA based upon Ajaxo's failure to carry its burden of proof and to support its royalty theories with credible, reliable, non-speculative evidence. As to the other issues raised on appeal, we find no reversible error and will affirm the judgment and the award of costs in favor of E*Trade.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

An extensive recitation of the facts and history of the case may be found in this court's prior decisions, *Ajaxo Inc. v. E*Trade Group Inc.* (2005) 135 Cal.App.4th 21 (*Ajaxo I*) and *Ajaxo Inc. v. E*Trade Financial Corp.* (2010) 187 Cal.App.4th 1295 (*Ajaxo II*). We summarize what is necessary for an understanding of the issues on appeal.

### A.  Underlying Dispute, Jury Trial (2003), and First Appeal

The dispute arose in 1999 when Ajaxo offered to license its software to E*Trade. (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1300.) E*Trade, an internet-based financial services company, wanted its clients to be able to access their online stock trading accounts using what at the time were new web-enabled wireless phones. (*Ibid*.) E*Trade was looking to partner with a company that could provide the wireless stock trading

2

capability.  (*Ibid*.)  Ajaxo's founder, Sing Koo,[2] had developed a sophisticated technology for wireless transactions called " 'Wirelessproxy XO' " that among other things supported Internet-based stock trading using wireless devices.  (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 27.)

In September 1999, E*Trade and Ajaxo entered a mutual nondisclosure agreement agreeing to protect and hold confidential each other's proprietary information.  (*Ajaxo I*, *supra*, 135 Cal.App.4th at pp. 27-28.)  Ajaxo proceeded with several technology demonstrations.  (*Id*. at pp. 28-31.)  E*Trade inquired whether Ajaxo was seeking a " 'venture partner.' "  (*Id*. at p. 30.)  Ajaxo was not, but it proposed terms to license Wirelessproxy XO to E*Trade for $860,000.  (*Ibid*.)  E*Trade communicated that it was working on a counter proposal, and Koo continued responding to requests for detailed technical information.  (*Id*. at pp. 30-31.)  In late October 1999, E*Trade made a counter offer of $200,000 with an option for an additional $200,000 per " 'device platform,' " which Koo understood as referring to the type of wireless device on which the software would be designed to run.  (*Id*. at p. 32 & fn. 14.)  E*Trade withdrew its counter offer shortly after, stating among other reasons that Ajaxo was too small to be an E*Trade partner.  (*Id*. at p. 32.)

The next month, E*Trade selected Everypath, Inc. (Everypath), as its wireless vendor.  (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 33.)  Everypath did not have a suitable wireless product at the time, but within a few months had raised venture capital to finance development of the solution that E*Trade wanted.  (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1300.)  In March 2000, E*Trade and Everypath entered into a service provider agreement for Everypath to develop and implement E*Trade's wireless trading

---

[2] During the relevant time period, Koo was Ajaxo's founder, chief executive officer (CEO), and sole owner; he gave the company to his sons before the royalty trial in 2012.  His wife, Connie Chun, was Ajaxo's cofounder and remains an officer of the company.

capability. (*Ibid*.) E*Trade paid Everypath $40,000 for its product (*Ajaxo I*, *supra*, at p. 33) and agreed to pay an additional $30,000 monthly service fee for up to 4,000 concurrent data users.

Ajaxo sued E*Trade and Everypath in October 2000. (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 40.) The operative complaint alleged misappropriation of trade secrets by both defendants and sought compensatory damages for lost profits, as well as unjust enrichment damages and reasonable royalties pursuant to section 3426.3 of the CUTSA. (*Ajaxo I*, *supra*, at p. 40.) It also alleged breach of the nondisclosure agreement by E*Trade and sought compensatory damages. (*Ibid*.)

The case was tried to a jury in 2003. (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 25.) The evidence showed that E*Trade helped to finance Everypath through an investment arm, that key employees were in contact with Everypath while E*Trade was evaluating Ajaxo's technology, and that a senior E*Trade engineer in technical discussions with Ajaxo left E*Trade and joined Everypath around that time. (*Id*. at pp. 33, 34, 36.) Ajaxo's expert witness testified in the first trial that Everypath's technology processes were " 'almost identical to' " Ajaxo's processes (*id*. at p. 34) and that based on his review of the Everypath source code library, "it would have been very difficult for Everypath to develop independently the wirelessproxy technology in two months" (*id*. at p. 35).

Ajaxo relied in the first trial on an unjust enrichment measure of damages for its misappropriation claim. (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1301.) The trial court granted a partial motion for nonsuit on the issue, however, finding that Ajaxo had presented insufficient evidence of unjust enrichment to E*Trade and Everypath. (*Ibid*.) The trial court still allowed the issue of liability for misappropriation to go to the jury, recognizing that if the jury were to find liability for misappropriation, Ajaxo might be entitled to reasonable royalties under section 3426.3, subdivision (b) of the CUTSA. (*Ajaxo II*, *supra*, at p. 1301.)

4

The jury in the first trial returned a special verdict in Ajaxo's favor. (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 40.) It found that E*Trade had breached the nondisclosure agreement by disclosing protected information to Everypath and awarded Ajaxo $1.29 million in damages for the breach. (*Id*. at pp. 25, 40.) The jury further found both E*Trade and Everypath liable for trade secret misappropriation but, because of the nonsuit, the jury did not award damages on the misappropriation cause of action. (*Ibid*.; *Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1301.) Ajaxo subsequently pursued its request for a permanent injunction against the continuing use of Ajaxo's trade secret. (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 41.) The trial court heard testimony and, in a detailed statement of decision, denied Ajaxo's claim for injunctive relief. (*Ibid*.) The trial court denied other posttrial motions, including E*Trade's motion for a new trial and for judgment notwithstanding the verdict, and the first appeal followed. (*Ibid*.)

On appeal in *Ajaxo I*, this court agreed with Ajaxo that the trial court erred in granting a nonsuit on damages for the trade secret misappropriation cause of action. (*Ajaxo I*, *supra*, 135 Cal.App.4th at pp. 63-64.) We reasoned that Ajaxo's contract and misappropriation causes of action were "inextricably linked" (*id*. at p. 63) such that the evidence presented on the breach of the nondisclosure agreement "directly addressed the degree to which E*Trade was unjustly enriched by its action of disclosing Ajaxo's trade secrets and proprietary information" (*ibid*.). Having concluded that substantial evidence existed to support Ajaxo's claim for damages for the trade secret misappropriation, we reversed the judgment and remanded the cause to the trial court for a new trial on damages for misappropriation.[3] (*Id*. at pp. 63-64, 69.) We rejected the parties' other contentions on appeal. (*Id*. at p. 69.)

---

[3] The disposition of the first appeal, which reversed the judgment as to "the trial court's grant of nonsuit on damages for misappropriation" (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 69) but affirmed the judgment "[i]n all other respects" (*ibid*.), is (continued)

**B.        Jury Trial on Misappropriation Damages (2008) and Second Appeal**

The remanded case proceeded against E*Trade.[4]  The question before the jury at the second trial was the extent of unjust enrichment to E*Trade resulting from its misappropriation of Ajaxo's trade secret.  (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1299.)  The jury was instructed that the amount of unjust enrichment was " 'the value of E*Trade's benefit that would not have been achieved except for its misappropriation' less 'the amount [of] E*Trade's reasonable expenses . . . .' "  (*Id*. at p. 1303.)

Ajaxo sought to prove more than $300 million in unjust enrichment to E*Trade.  (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1299.)  Ajaxo's evidence focused on the companies' licensing discussions and on expert testimony evaluating the benefit that E*Trade obtained from its wireless trading capability.  (*Id*. at p. 1302.)  Ajaxo's expert did not consider E*Trade's actual profits from wireless trading or the fact that no more than one-half of 1 percent of E*Trade clients ever traded on wireless devices.  (*Ibid*.)  The trial court denied a motion for nonsuit on the issue of unjust enrichment.  (*Ibid*.)

E*Trade then produced evidence that its wireless trading strategy " 'didn't pan out.' "  (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1303.)  The evidence showed that E*Trade's wireless trading expenses, including transactional costs, labor, and service provider fees paid to Everypath, exceeded wireless trading commissions every quarter, resulting in a net loss of about $2.5 million.  (*Ibid*.)

The jury awarded Ajaxo no damages.  In a special verdict, the jury valued E*Trade's benefit from the misappropriation at $3,990,852 and calculated E*Trade's

---

relevant to the issue in this appeal of the trial court's prevailing party determination and costs award.  We discuss it in more detail *post* (part II.E.).

[4] Everypath went out of business and the trial court bifurcated the case.  (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1302.)  Issues related to E*Trade's involvement in financing Everypath were addressed in pretrial rulings and were put to rest in *Ajaxo II*, *supra*, at pages 1304 through 1306.

reasonable expenses in achieving the benefit at $6,411,761, resulting in a net loss of approximately $2.4 million. (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1303.) Having failed to prove unjust enrichment, Ajaxo asked the trial court to award reasonable royalties under section 3426.3, subdivision (b).[5] E\*Trade opposed the request, arguing that a royalty award was not available because evidence in the record to support a measure of damages for either actual losses or unjust enrichment made those damages " 'provable' " within the meaning of the statute. (*Ajaxo II*, *supra*, at p. 1303.) The trial court agreed with E\*Trade, finding " 'that Ajaxo had proven unjust enrichment damages against E\*Trade with no net amount in terms of actual damages.' " (*Ibid.*) The trial court accordingly denied Ajaxo's request for reasonable royalties and entered judgment in favor of E\*Trade. (*Ibid.*)

This court reversed. (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1316.) In *Ajaxo II*, we considered whether unjust enrichment was " 'provable' " within the meaning of section 3426.3, subdivision (b) where the jury's verdict showed E\*Trade was not enriched. (*Ajaxo II*, *supra*, at p. 1309.) Looking to the statutory language and legislative history of the CUTSA, as well as to the public policies underlying trade secret laws, we determined that section 3426.3, subdivision (b) was intended to allow "for reasonable royalties when the plaintiff could not prove any loss and the defendant 'made no actual profits.' " (*Ajaxo II*, *supra*, at p. 1311.) To refuse to consider a reasonable royalty where liability had been proven but the defendant had not made a profit would ignore the fact that a defendant might achieve nonpecuniary benefits from stealing a trade secret and would run contrary to the underlying public policies that seek to reward innovation and maintain standards of commercial ethics. (*Id.* at pp. 1311-1312.) We concluded that

---

[5] As noted earlier and discussed in detail below, section 3426.3, subdivision (b) of the CUTSA provides that "[i]f neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited."

7

"where a defendant has not realized a profit or other calculable benefit as a result of his or her misappropriation of a trade secret, unjust enrichment is not provable within the meaning of section 3426.3, subdivision (b), whether the lack of benefit is determined as a matter of law or as a matter of fact." (*Id.* at p. 1313.) We also rejected E*Trade's argument that Ajaxo's actual losses were provable. (*Id.* at p. 1315.)

*Ajaxo II* outlined some evidence that could allow the trial court to determine " 'what royalty, if any, would be reasonable under the circumstances.' " (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1313, quoting *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 628.) We recognized that "[e]vidence of the negotiations between the parties pertaining to the licensing of Ajaxo's software and evidence of the price E*Trade paid for the license it obtained from Everypath could have served as a starting point for the trial court's estimate of what the parties would have agreed was a fair licensing price at the time the misappropriation occurred." (*Ajaxo II*, *supra*, at p. 1313.) In sum, *Ajaxo II* held that "since neither actual loss nor unjust enrichment is provable, the trial court had discretion pursuant to section 3426.3, subdivision (b) to order payment of a reasonable royalty." (*Id.* at p. 1315.) We remanded the matter to the trial court "to exercise its discretion in that regard." (*Ibid.*)

### C.     Reasonable Royalty Trial (2012-2015) and Present Appeal

The parties disagreed on remand about how to implement the ruling in *Ajaxo II* and the discretionary language of section 3426.3, subdivision (b). The trial court ultimately bifurcated the proceedings. It interpreted *Ajaxo II* as requiring it to exercise its discretion first as to *whether* Ajaxo is entitled to royalties, and second as to the amount if any. It therefore set for trial the "sole issue" of "whether Ajaxo is entitled to any monetary award based on a royalty claim" (phase I trial). The second phase of trial "to determine the amount of any such award" would be contingent on the determination of Ajaxo's entitlement to a royalty award (phase II trial).

8

The parties exchanged further written discovery, designated and deposed experts, and agreed that previously-admitted testimony and exhibits would be admissible if relevant and offered by a party. The phase I trial spanned several days in 2012 and 2013; the trial court received live testimony from seven witnesses, transcripts from 19 witnesses, and more than 125 admitted exhibits. The phase II trial took place in December 2014. In the end, the trial court issued a 33-page statement of decision denying a reasonable royalty. We summarize the positions taken at trial, the evidence submitted, and the trial court's rulings as are pertinent to the issues raised on appeal.

### 1. *Royalty Trial*, *Phase I*

Ajaxo focused on this court's determination that Ajaxo had presented enough evidence in the second trial for a reasonable royalty determination. (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1313.) It identified several predicate issues that it contended had been conclusively established and warranted an award, in an amount to be assessed, of a reasonable royalty. These included E*Trade's *disclosure* of the trade secret to Everypath, for which the jury in the first trial awarded $1.29 million in contract damages for breach of the nondisclosure agreement, as well as E*Trade's *use* of the trade secret via the wireless stock trading platform developed by Everypath, for which the jury in the second trial calculated a benefit of almost $4 million to E*Trade that it otherwise would not have achieved. Ajaxo argued that discretion under the statute did not mean a reasonable royalty could be withheld when so proven, and that the record established Ajaxo's entitlement to proceed to a phase II trial on the nature and amount of a reasonable royalty.

Ajaxo further contended that it had not been compensated for the trade secret misappropriation, which warranted separate damages from the contract damages awarded in the first trial, and that E*Trade's lack of profit from wireless trading did not preclude a reasonable royalty award under California law. Ajaxo also sought to repudiate any claim

9

that its founder, Sing Koo, had destroyed relevant evidence or employed obstructive tactics that undermined Ajaxo's ability to prove its claim to a reasonable royalty amount. Ajaxo contended that the spoliation issue, which stemmed from the destruction of source code and computer hardware earlier in the litigation, had been fully adjudicated in the first trial with the jury's rejection of E*Trade's unclean hands defense, and was again addressed and rejected by the trial court in the second trial in connection with E*Trade's unsuccessful motion for terminating sanctions.

E*Trade in contrast contended that Ajaxo had engaged in a pattern of "purposeful destruction of evidence and knowing provision of false and obstructionist testimony" which prevented any fair assessment of the factors to determine a royalty and precluded a royalty award under the unclean hands doctrine. E*Trade focused on the fact that as a result of actions taken by Ajaxo's principals, Koo and his wife Connie Chun, the company had retained no relevant financial data and had "systematically destroyed every single vestige" of Ajaxo's wireless application, including source code and documentation. E*Trade contended that it was impossible to evaluate the royalty claim without these materials because there was no way to identify those parts of the software that consisted of Ajaxo's trade secret and to assign a relative value.

E*Trade also argued that Ajaxo had been fully compensated for all detriment proximately caused by the misappropriation of its trade secret, which consisted of E*Trade's *disclosure* of the trade secret to Everypath—for which E*Trade paid full satisfaction of the $1.29 million awarded for breach of the nondisclosure agreement—and of Everypath's *use* of the trade secret disclosed by E*Trade, for which Ajaxo separately obtained a $90 million default judgment against Everypath. E*Trade also challenged the notion that a royalty award could be based on *Everypath's* use of the trade secret and pointed to the trial court's prior rulings that rejected attempts by Ajaxo to hold E*Trade liable for Everypath's use. E*Trade posited that even assuming a royalty was proper, the record evidence demonstrated any reasonable amount to be less than and fully

10

encompassed within the amount already paid to Ajaxo by E*Trade, particularly given the lack of any profit to E*Trade from wireless trading. E*Trade urged the trial court to end the proceedings after phase I, which it argued was well within its discretion under *Ajaxo II* and section 3426.3, subdivision (b).

The trial court denied Ajaxo's request to move to phase II based on the existing record. The parties proceeded with the phase I trial to the court, in which both sides introduced live testimony, prior trial and deposition transcripts, and previously-admitted exhibits.

Ajaxo relied on Koo as its sole witness and designated expert on entitlement to royalties. The trial court qualified Koo over E*Trade's objection as an expert on reasonable royalties and licensing, noting that questions about his qualifications and his position as a party would go to the weight of the evidence. Koo testified that there were three models or theories that could determine an award of royalties. These were the " 'enterprise direct use' " model, the "end-user subscription" model, and the " 'value added developer distribution' " model.[6] Koo described how each model could be applied to E*Trade's use of Ajaxo's trade secret and used to assess a reasonable royalty. Koo also testified about license agreements between Ajaxo and several third party companies, focusing on a Hong Kong company called Infocast, as a means to establish a royalty amount for the misappropriated trade secret.

---

[6] The terms used for Ajaxo's three royalty models are not always consistent. To avoid confusion, we follow the trial court's statement of decision which refers to (1) the $23 million " 'enterprise direct use' " model based on E*Trade's direct use of the trade secret (sometimes referred to in the record as an "enterprise licensing provisioning method"), (2) the $41 million "value-added developer distribution" model based on hypothetical runtime licenses to 92 Everypath customers (sometimes referred to as " 'developer's license with sublicenses' " or "master-developer license coupled with run-time licenses" model), and (3) the " 'end-user subscription' " or " 'subscription' " model."

11

E*Trade objected to Koo's testimony about the royalty models, claiming that he did not disclose those opinions or the basis for them in his expert disclosure or deposition before trial. The trial court overruled the objection without prejudice to a later motion to strike, which E*Trade filed at the close of phase I and which we discuss in detail *post* (part I.C.3.).

Regarding E*Trade's destruction of evidence claims, Koo testified that a laptop used as Ajaxo's development server was subject to a demand for inspection in January 2006 in litigation involving another company founded by Koo called KC Multimedia. After the inspection had begun, a lawyer for KC Multimedia called Koo to tell him the hard drive had been "wiped clean . . . ." Koo ordered the lawyers to halt the inspection until he could get there; by the time he had arrived, the expert who had conducted the inspection had packed up his items and left. Koo testified that the server's hard disk was encrypted, which would make it unreadable when removed from the computer. He "freaked out" when he saw what the expert had done. The laptop was returned to Koo after the KC Multimedia litigation ended, but it would not turn on so he disposed of it.

E*Trade designated several witnesses who had been involved in earlier stages of the case to testify about the destruction of the source code and documentation containing or reflecting Ajaxo's trade secret. Robert Stillerman testified as a computer forensic expert who had been retained in 2005 in the KC Multimedia litigation to image the hard drive of Ajaxo's development server. He testified that he had followed the agreed upon protocol but had not been able to access the drive and believed it had been erased or encrypted. Stillerman opined that developers usually use versioning software to back up source code, and that source code is needed to evaluate a trade secret implemented through a software program.

E*Trade also called Lynell Phillips, a computer forensics expert who had been retained by KC Multimedia and was present to observe Stillerman's inspection of the hard drive in 2006. Phillips testified that she did not believe that Stillerman had damaged

the hard drive but rather that the drive was password protected or encrypted. Both Stillerman and Phillips testified that their understanding at the time was that Koo had ordered the inspection to end, which had prevented them from making additional attempts to access the drive.

Defense forensic expert Peter Garza testified for E*Trade as an expert in electronic discovery, forensic computer analysis and inspection, and the preservation of evidence. He opined that contrary to Ajaxo's claims, the inspection by Stillerman did not damage or erase Ajaxo's development server. He also testified that the encryption claimed by Koo was not available yet for that model and operating system, and therefore Koo could not have enabled it on the development server.

E*Trade also proffered David Klausner, an expert in valuation of computer software programming and intellectual property who had been previously retained by E*Trade for the second trial on misappropriation damages. Klausner testified that having reviewed the available remaining documentation of Ajaxo's trade secret, as well as the trial and deposition testimony of Koo and of Ajaxo's technical expert in the first trial, Earl Rennison, he did not have enough information to evaluate Ajaxo's trade secret. Klausner identified several factors that he could not assess without Ajaxo's source code—which was lost when Koo destroyed the development server—including the wireless application's scalability, usability, maintainability, uniqueness, or completeness. Klausner opined that it was not possible to value the trade secret without its source code or equivalent documentation.

E*Trade also offered excerpts of prior testimony of both Chun and Koo, highlighting what it argued were irreconcilable conflicts in evidence on such subjects as whether Ajaxo's Wirelessproxy XO product was identical to a later-developed Ajaxo product called "Smart Agent" or the Smart Agent toolkit, whether Ajaxo in 2001 executed licensing agreements with various third parties to use Wirelessproxy software despite the apparent nonexistence of any written executed agreements, and whether

13

Ajaxo and E*Trade ever agreed upon price and terms for the would-be licensing agreement.

Phase I ended with the parties' submission of written closing argument and E*Trade's motion to strike the undisclosed expert testimony of Sing Koo. The trial court issued a short, written order in May 2014 making what it determined was "an extremely close call" to proceed to the second phase of trial. It cautioned that its decision was "not meant to suggest that Ajaxo is entitled to any royalty at all but rather that" the testimony received, prior trial results, and appellate court decisions in *Ajaxo I* and *Ajaxo II* required an "inquiry into value . . . ." The trial court stated that the evidence admitted in phase I would be considered in phase II. It reserved a decision on E*Trade's motion to strike until the end of phase II.

### 2. *Royalty Trial*, *Phase II*

Phase II of the royalty trial began in December 2014. Ajaxo contended that it was entitled to a reasonable royalty of $65,660,000. Ajaxo's expert, Sing Koo, calculated the amount using two proposed royalty models and introduced a third model as an alternative. Ajaxo also sought exemplary damages of $131,320,000 pursuant to section 3426.3, subdivision (c), based on the jury's finding in the first trial of willful and malicious misappropriation.[7]

E*Trade rejected any royalty amount. It argued that Ajaxo had exponentially inflated whatever limited value could be reasonably discerned from the record and had undermined its ability to prove a reasonable royalty due to the destruction of its own

---

[7] Section 3426.3, subdivision (c) states that "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under" section 3426.3, subdivision (a) authorizing recovery of damages for actual loss or unjust enrichment caused by misappropriation, or section 3426.3, subdivision (b) authorizing a reasonable royalty if neither damages nor unjust enrichment are provable. The trial court bifurcated consideration of exemplary damages pending the outcome of the royalty trial.

evidence. E*Trade moved to exclude two of Koo's expert opinions as inadmissible and premised on unproven, unprovable, or demonstrably false facts. E*Trade also moved to exclude those parts of Koo's opinions that were not properly disclosed during expert discovery. The trial court indicated that it would consider E*Trade's objections to Koo's testimony in a motion to strike filed with the closing brief.

E*Trade countered Koo's opinions with two of its own experts. Bruce McFarlane, testifying as an expert in assessing reasonable royalty damages, opined that the flaws and deficiencies in Koo's analysis rendered his royalty opinion incorrect and unreliable. Terry Lloyd, testifying as an expert in financial analysis, accounting, and valuing intellectual property including reasonable royalty analysis, opined that he was unable to develop a reasonable royalty opinion because too many critical factors were missing from the record, including a way to identify the trade secret, evidence of the trade secret's value, and evidence that E*Trade actually used the trade secret after having disclosed it to Everypath.

The parties designated thousands more pages of prior testimony and evidence. We attempt to distill the material presented during phase II of the royalty trial into two thematic categories. These are Koo's expert testimony and proposed royalty models, and E*Trade's experts' rejection of any royalty amount.[8]

---

[8] The trial court never reached the issue of exemplary damages because it declined to award any royalty. As noted *ante* (fn. 7), the statute authorizes exemplary damages for willful and malicious misappropriation "in an amount not exceeding twice any award made under subdivision (a) or (b)." (§ 3426.3, subd. (c).) Although the jury found willful and malicious misappropriation in the first trial and awarded $1.29 million in damages for breach of the nondisclosure agreement, the breach of contract damages do not satisfy the statutory predicate for exemplary damages, based on an award for "actual loss caused by misappropriation" or "unjust enrichment caused by misappropriation" (§ 3426.3, subd. (a)) or alternatively on an award of a reasonable royalty (*id*., subd. (b)).

15

*a. Ajaxo's Royalty Models and Koo's Expert Testimony*

Ajaxo expressed the $65,660,000 royalty as the sum of two types of non-overlapping, claimed trade secret use. These were (1) E*Trade's direct use of the trade secret with its own customers, which Ajaxo valued at $41.5 million under the "enterprise direct use" model, and (2) E*Trade's disclosure to Everypath and Everypath's implementation of the trade secret in products sold to 92 customers, which Ajaxo valued at $24,160,000 under the "value-added developer distribution" model. Ajaxo presented an alternative model to its enterprise direct use model, which it termed the "end-user subscription" model, valued at approximately $3.3 billion. Ajaxo framed these figures as "conservative" because the enterprise direct use model assumed fewer concurrent users than E*Trade had actually anticipated at the time, and the value-added developer distribution model assumed only one license for each of Everypath's 92 customers, though a prudent business practice would have required multiple licenses for customers.

Koo testified that the factors he considered in forming his opinion of a reasonable royalty included Ajaxo's licensing practices, E*Trade's use of the misappropriated trade secret, and the *Georgia-Pacific* factors, referring to a patent-infringement case commonly cited for its list of factors relevant to determining a royalty rate in intellectual property licensing. (*Georgia-Pacific*, *supra*, 318 F.Supp. 1116.) Koo explained that Wirelessproxy XO was a software toolkit available for developers with a developer license to create their own wireless applications, and Ajaxo's later-developed Smart Agent toolkit was the same technology rebranded. Koo said that in his mind Smart Agent was "always a synonym to Wirelessproxy XO." Both programs contained the trade secrets in this case and nothing more. Koo opined that in 1999, Ajaxo's Wirelessproxy XO was the only front-end solution for wireless access to a back-end web server like E*Trade's stock trading platform, and that as of the first trial in 2003, only Ajaxo and Everypath could provide that capability.

16

Koo described how E*Trade's misappropriation of the Ajaxo trade secret and use of Everypath's resulting wireless application applied to each of the royalty models. He based the enterprise direct use and value-added developer distribution models on an April 2000 transaction between Ajaxo and Hong Kong-based Infocast for Ajaxo's Smart Agent toolkit. Infocast paid Ajaxo a $700,000 license fee for the right to incorporate Smart Agent into Infocast's products and to offer runtime licenses at retail price to its customers. Ajaxo received $255,000, or 50 percent of a runtime license fee that totaled $510,000 over three years, for a runtime license between Infocast and a company called Chong Hing Securities.

Mapped onto a hypothetical licensing arrangement with E*Trade, Koo explained that for the value-added developer distribution model, E*Trade would be the hypothetical trade secret owner and Everypath would take Infocast's position as the value-added reseller. Koo calculated, based on prior evidence, that Everypath had deployed Ajaxo's trade secret in its software toolkit to 92 customers between the time of the misappropriation and the first trial in 2003. Koo applied the pricing from Ajaxo's license with Infocast and concluded as to that model that Everypath would have owed E*Trade $700,000 for the master-developer license and 50 percent of a $510,000 runtime license fee for each of the 92 deployments to its customers, for a total of $24,160,000.

Koo also mapped the Infocast license onto the enterprise direct use model for E*Trade's direct use of the appropriated technology, developed by Everypath, for its stock trading platform. Koo estimated that E*Trade had a minimum 4,000 concurrent user capacity in April 2000 based on its development and service provider agreement with Everypath. Koo compared that user capacity to the Infocast license, which accommodated 50 concurrent users, and calculated that E*Trade would have required a minimum of 80 runtime licenses (4,000 ÷ 50 = 80) at $510,000 each, plus the master license for $700,000, for a total of $41.5 million.

17

Koo also described a third "end-user subscription" model patterned after a service in which Ajaxo had functioned as an application service provider for customers of a certain Fidelity brokerage group to access their accounts. The fee for the service was $30 per month per customer. Applying that model, Koo testified that an E*Trade customer wishing to use the wireless trading service would pay a monthly subscription fee, which he apportioned by 50 percent to arrive at what he believed was a reasonable royalty rate for the relevant time. Because E*Trade had provided wireless trading access to its entire customer base, Koo multiplied the royalty rate by the total number of customer accounts over the six year period that E*Trade offered Everypath's service, arriving at a total royalty amount of $3,353,613,580. This model was an alternative to the enterprise direct use model, because both measured a royalty based on E*Trade's direct use.

On cross-examination, Koo agreed that his opinions of a royalty amount based on the end-user subscription model and enterprise direct use model were not set forth in his expert report or deposition testimony. He acknowledged that in developing his royalty opinion, he did not use the figures contained in either parties' licensing proposals during the period of negotiations between Ajaxo and E*Trade. And he admitted that his royalty calculations did not rely on positions taken by the parties during the negotiations, like the fact that E*Trade proposed a $200,000 licensing option per device platform serving up to 20,000 unique users, or that Ajaxo never indicated a 50 concurrent user limitation for its application.

Koo also acknowledged on cross-examination that his royalty opinion did not consider the financial terms of E*Trade's actual service agreement with Everypath. Nor did he utilize evidence in the record regarding actual usage of the wireless trading platform by E*Trade customers. He instead relied on E*Trade's total accounts reported in 10-K filings. He agreed that the license fees paid by Infocast for Ajaxo's Smart Agent toolkit and the runtime license to Chong Hing were the only instances in which Ajaxo

18

had received those prices for its Smart Agent product. Koo reiterated that Wirelessproxy XO was "the same thing" as Smart Agent despite his prior testimony from a 2002 deposition describing Smart Agent as an " 'evolution' " of Wirelessproxy. Koo also testified that the value-added developer distributor model assumed that all of the 92 purported customers of Everypath used the Ajaxo trade secret, though he did not review Everypath's actual pricing or the terms of individual customer agreements. As for the subscription model, Koo agreed with defense counsel's assessment that actual customer usage of the subscription service was "extremely small."

Koo opined that the financial terms that existed between E*Trade and Everypath were not a reliable source of information in formulating his opinion on a reasonable royalty, because their position as infringers undermined the reasonableness of their mindset in negotiating terms. Koo confirmed that the code and all copies of the application that Ajaxo had built for E*Trade and for other applications were gone at the time of trial.

### b. E*Trade's Experts Reject Imposition of Any Royalty

McFarlane and Lloyd, E*Trade's experts during phase II of the royalty trial, rejected these asserted models for a reasonable royalty.

McFarlane opined that multiple flaws and deficiencies rendered Koo's royalty analysis unreliable and his royalty rate "simply wrong." He identified six explicit assumptions that Koo's model relied on to arrive at his $65.66 million reasonable royalty amount. One assumption was that in using the Infocast-Ajaxo agreement as a benchmark for the hypothetical negotiation with E*Trade, Koo did not adjust for differences, even though Infocast's license to the Smart Agent toolkit was for "an actual software" whereas E*Trade's license for Wirelessproxy XO would have covered the trade secret only. McFarlane explained that this was a "fundamental difference" that Koo did not account for. Koo also did not account for maintenance, upgrade, diagnostic, and installation

19

services that the $700,000 Infocast license expressly included.  McFarlane opined that Koo's model failed to isolate the trade secret and apportion the value as required for a reliable and accurate royalty measure.  McFarlane believed that the actual negotiations between Ajaxo and E*Trade in late 1999 offered a "particularly probative" source for a royalty analysis; but Koo did not take these actual negotiations into account in his calculations.

McFarlane opined that another flaw in Koo's royalty analysis was the assumption about the total number of concurrent users, which failed to consider the extent of documented, actual use by E*Trade brokerage customers.  McFarlane found the assumption that E*Trade would need to purchase a separate runtime license for every set of 50 concurrent users to be "completely counter factual" to the various agreements that Ajaxo held with entities like Infocast and Fidelity, none of which limited concurrent users per runtime license.  McFarlane criticized Koo's reliance on the Infocast-Chong Hing agreement for this assumption, noting the copy of the agreement in the record was incomplete, and the language regarding 50 concurrent users did not appear in the section on license fee.  McFarlane pointed out similar problems with Koo's reliance on the Chong Hing agreement for his assumption that Everypath customers would hypothetically pay $510,000 for a runtime license.  He also disagreed with Koo's application of that amount—which in the Infocast agreement with Chong Hing represented the sum of three runtime licenses over three years—to Everypath's 92 customers without reviewing those contracts and considering the terms of use for each one.

McFarlane strongly disagreed with Koo's dismissal of the transactions between E*Trade and Everypath based on their role as infringers.  He testified that damage experts routinely and properly consider what an alleged infringer has offered or paid for the subject technology.  McFarlane also explained that under California's head start rule, codified in section 3426, a court may order payment of a reasonable royalty for no longer

than the period of time the use could have been prohibited. McFarlane testified that Koo greatly over-estimated reasonable royalty damages by failing to consider the head start period, which evidence from the 2008 trial suggested would have set an economic cap on what E*Trade as a prudent licensee would be willing to pay for the trade secret.

Lloyd's testimony centered on the nonavailability of the information he needed to determine a reasonable royalty rate. He opined that the primary defect was the absence of any definition of the misappropriated trade secret or evidence of its economic value. According to Lloyd, the record contained "conflicting descriptions" of what the trade secret may have been or what it did; but there was no example of it. He explained that the source code was necessary to identify the trade secret and apportion its value, because according to testimony at various points by Chun and Koo, Wirelessproxy XO contained components of earlier Wirelessproxy technology owned by Koo's other company, KC Multimedia, and also was not the same as the Smart Agent toolkit later licensed to Infocast. Yet the source code had been destroyed. Lloyd also stated that he had not been able to review the financial records needed to assess income history and distinguish income from, for example, consulting services versus licensing fees.

Using the available evidence, Lloyd addressed each of the *Georgia-Pacific* factors. He reviewed the available record of Ajaxo's transactions and negotiations for its products and services, including with Infocast and Fidelity, as well as with IWAPI, Sephora, and Charles Schwab, and concluded there was "little, if any, value to the trade secret." Even considering the licensing negotiation between Ajaxo and E*Trade, Lloyd opined there was "no way to disaggregate" the value of any trade secret embedded in the package being negotiated. At most, the letters of intent that E*Trade transmitted to Ajaxo shortly before pulling out of any deal showed that "some minimal amount might have been paid, but only based on very high usage rates."

Lloyd emphasized that the availability of wireless stock trading did not increase E*Trade's trading volume; rather, the volume of wireless trades during the relevant time

21

frame never exceeded one-half of one percent, or five trades in a thousand. Further, the wireless trading function was not profitable. Lloyd opined that the trade secret offered little economic advantage because, even if its front-end solution remained unknown, as Koo had testified, other companies came up with comparable back-end solutions quickly. Lloyd found no evidence of *use* of the trade secret by E*Trade, as required by California law for payment of a royalty. He concluded that "there was simply a lack of data or information to allow us to come to a reasonable conclusion with any degree of certainty about reasonable royalty."

### 3. *Closing Briefs and E\*Trade's Motion to Strike*

Each side submitted closing briefs that summarized and reiterated their arguments during both phases of the royalty trial.

Ajaxo argued that it was entitled to a reasonable royalty based on both E*Trade's *direct use* of the misappropriated trade secret, under either the enterprise direct use model or the end-user subscription model, as well as on E*Trade's *disclosure* to Everypath under the value-added developer distribution model. It maintained that application of the *Georgia-Pacific* factors supported the royalty award proposed by Koo, that apportionment was not appropriate because the royalty models were based only on licensing of the misappropriated trade secret, and that the head start rule was inapplicable. Ajaxo further maintained that the blueprints or "know-how" stolen by E*Trade was more valuable than the source code, that the nature of the trade secret was established during the first trial, and that the jury verdict in the second trial established E*Trade's use of the trade secret. Finally, Ajaxo criticized E*Trade for trying to revive issues related to the destruction of evidence and nonavailability of the source code, all of which Ajaxo contended had been litigated and resolved in Ajaxo's favor.

E*Trade argued that Ajaxo had failed to satisfy its burden of proof and had introduced incompetent evidence to support a reasonable royalty. It urged the trial court

22

to exclude or disregard each of Ajaxo's royalty models as dependent on erroneous assumptions and speculation and at odds with establish methodology for determining a reasonable royalty, like the head start rule and apportionment. E*Trade reiterated its phase I arguments that Ajaxo was not entitled to a reasonable royalty because it had already received compensation under the breach of nondisclosure agreement claim, because there was no evidence of E*Trade's use of the trade secret, and because of Ajaxo's purposeful destruction of evidence. E*Trade argued in the alternative that any royalty award must be less than $250,000—or half the license fee proposed by Ajaxo in September 1999—and offset by the prior judgment.

Consistent with the trial court's direction based on E*Trade's objections at trial, E*Trade also moved to strike those parts of Sing Koo's expert testimony relating to (1) the enterprise direct use model assessing a $41.5 million royalty for E*Trade's alleged " 'direct use' " of Ajaxo's trade secret, (2) the " 'subscription' " model assessing royalties of up to $3.33 billion, as an alternative to the direct use model, and (3) the opinion that Ajaxo's technology was unique because it provided a " 'front-end' " as opposed to a " 'back-end' " solution for wireless transactions.

E*Trade argued that contrary to the rules of expert discovery, Koo did not fully disclose these theories prior to trial. Instead, Koo's expert report described only the $23.4 million royalty under the value-added developer distribution model. Koo disclosed the "subscription" model during the second day of his deposition by obliquely referring to E*Trade's 10-K filings. In response to probing by E*Trade's counsel, Koo then described a model in which Ajaxo was entitled to a $15 monthly fee for every E*Trade brokerage customer, though he had not yet calculated the total amount owed, which he stated would "obviously" reach into the hundreds of millions of dollars. Then, three days before the start of the phase II trial, Ajaxo served its trial brief, disclosing for the first time Koo's $41.5 million "direct use" model. This new theory relied on a " '50 concurrent user' limitation" that E*Trade contended was being used to justify an

23

80-license multiplier, a concept that was never before raised in the case. E*Trade similarly claimed that Koo's opinion at trial about the uniqueness of Ajaxo's "front-end" system for wireless trading was not disclosed in Koo's expert report or depositions.

Ajaxo opposed the motion to strike. It accused E*Trade of distracting from the merits in "this David versus Goliath" case by "feign[ing] prejudice" from the allegedly insufficient disclosures. Ajaxo argued that Koo had described each of the royalty models in his phase I trial testimony and had further elaborated on those opinions in his depositions. It argued that if E*Trade required additional details about Koo's opinions, it should have asked those questions during his depositions. Regarding E*Trade's motion to strike testimony about Ajaxo's unique, front-end solution for a wireless trading, Ajaxo argued that the nature of the solution was discussed throughout the first trial and was not new material susceptible to being stricken.

### 4. *Trial Court's Statement of Decision*

The trial court issued a tentative decision in August 2015 and final statement of decision in September 2015. The court granted E*Trade's motion to strike expert testimony, excluding evidence of the end-user subscription and enterprise direct use royalty models, and rejected Ajaxo's claim to a reasonable royalty.

The trial court made the following findings: (1) Ajaxo did not prove that it was entitled to a royalty award against E*Trade; (2) assuming Ajaxo was entitled to an award, it did not prove the amount of any reasonable royalty; (3) Ajaxo's value-added developer distribution royalty model relied on speculation and assumptions that were not proved or were contrary to the weight of the evidence; (4) Ajaxo's royalty theory was excessive in amount and not "reasonable" under the facts and circumstances; (5) Ajaxo failed to tether its royalty claim to E*Trade's trade secret misappropriation, as found by the jury in the underlying 2003 liability trial; (6) consideration of the *Georgia-Pacific* factors dictated that no royalty should be awarded; (7) Ajaxo lost or destroyed evidence relevant to the

24

royalty inquiry and to a fair evaluation of the trade secret at issue; (8) Ajaxo's witnesses gave contradictory testimony on facts material to numerous issues bearing on entitlement to a royalty, the amount if any, and the circumstances under which all remaining copies of the software source code and Javadoc were lost or destroyed; and (9) Ajaxo acted with unclean hands in destroying evidence during the pending litigation and committing other improper conduct related to the issues to be decided in this trial. We examine these findings in more detail in our discussion below.

The trial court entered judgment in favor of E*Trade and against Ajaxo regarding the claim for reasonable royalties. It awarded E*Trade its costs of suit.

### D.    Ajaxo's Motion for a New Trial

Ajaxo subsequently filed its intent to move for a new trial and to set aside the judgment. It also moved to strike costs.

Ajaxo's motion for a new trial rested on three grounds. First, Ajaxo claimed that irregularities in the proceedings deprived it of a fair trial (Code Civ. Proc., § 657, subd. 1). Ajaxo argued that it was error to exclude the two royalty models because each model was fully disclosed before trial and E*Trade was not prejudiced by any allegedly tardy disclosure. Ajaxo challenged the trial court's finding that Ajaxo had "lost or destroyed the necessary evidence" as inconsistent with the prior judgment against Everypath for $90 million, which Ajaxo contended had not required examination of source code but had relied on the same misappropriation evidence from the first trial. And Ajaxo contended that the trial court ignored testimony and evidence adduced in previous phases that established the nature of the trade secret.

Second, Ajaxo cited inadequate damages (Code Civ. Proc., § 657, subd. 5) as ground for a new trial, claiming the trial court ignored "substantial, reliable, and persuasive evidence" provided by the value-added developer distribution model. Ajaxo argued that the court misunderstood the model, which did not base the royalty calculation on Everypath's actions but on E*Trade's actions as the hypothetical owner of the trade

25

secret. Thus, E*Trade would have been entitled to a master-developer license fee of $700,000 from Everypath and to 50 percent of the $510,000 runtime license fee for each of Everypath's sublicenses, for a total of $24 million.

Third, Ajaxo claimed that errors of law deprived it of a fair trial (Code Civ. Proc., § 657, subd. 7), including the exclusion of the royalty models, the erroneous application of the *Georgia-Pacific* factors and head start doctrine, and the erroneous treatment of E*Trade's unclean hands argument as a defense. Ajaxo also sought, in the alternative, to vacate or amend the judgment (Code Civ. Proc., § 663), citing error in the award of costs to E*Trade.

E*Trade opposed the motion, supported by the declarations of counsel and submission of excerpts from the trial and case record.

The trial court denied the motion for a new trial in a written order. It found that Ajaxo had not demonstrated any irregularity in the proceedings, insufficiency of damages, or error of law warranting a new trial. It noted that it exercised its discretion to deny Ajaxo's request for reasonable royalties "for numerous separate and independently sufficient reasons" as set forth in its statement of decision. It concluded that Ajaxo's arguments in support of a new trial, even if meritorious, would not affect its ultimate conclusion to deny a royalty award. The trial court also confirmed its determination that E*Trade was entitled to its costs of suit as the prevailing party. It reasoned that the judgment had resolved Ajaxo's only remaining cause of action for misappropriation of trade secrets, and that Ajaxo had recovered no relief.

Ajaxo timely appealed from the judgment.

### E. Ajaxo's Motion to Strike Costs

Ajaxo challenged the award of costs to E*Trade as contrary to the statutory framework for cost recovery, which defines "prevailing party" to include "the party with a net monetary recovery." (Code Civ. Proc., § 1032, subd. (a)(4).) Ajaxo contended that it was the prevailing party based on the first jury verdict in 2003 and through both prior

26

appeals.  It argued that under the governing law, E*Trade's defeat of its claim for a reasonable royalty neither altered its prevailing party status nor brought E*Trade within any of the other statutory definitions of a prevailing party.  In the alternative, Ajaxo argued that the trial court should tax portions of E*Trade's claimed costs as unreasonable.

E*Trade opposed the motion to strike or tax costs, arguing that Ajaxo was not the prevailing party and had not been since the entry of final judgment on the breach of contract cause of action.  E*Trade recounted the unique procedural history of the case, beginning with the disposition of the first appeal, which effectively "split the case in two," allowing entry of final judgment and payment of damages on the breach of contract cause of action while remanding for a new trial on the misappropriation cause of action. (See *Ajaxo I*, *supra*, 135 Cal.App.4th at p. 69.)  After the California Supreme Court denied review of *Ajaxo I* in 2006, E*Trade satisfied the $1.29 million judgment, plus costs, interest, fees, and attorney fees on appeal, though the misappropriation cause of action was not yet resolved.  E*Trade argued that it therefore became "inevitable" that there would be two final judgments between the parties.

According to E*Trade, Ajaxo was then able to litigate the trade secret claim "as if a new lawsuit had begun," seeking $302 million in unjust enrichment damages from the jury in the second trial and leading to the 2008 verdict which awarded Ajaxo nothing. The trial court entered judgment for E*Trade in 2008, including costs; when E*Trade filed its memorandum of costs seeking $134,080.06, Ajaxo did not move to tax the costs award.  Rather, Ajaxo appealed.  This court in the second appeal reversed the judgment and remanded for the trial court to exercise its discretion regarding whether Ajaxo should be paid a reasonable royalty.  (*Ajaxo II*, *supra*, 187 Cal.App.4th at pp. 1315-1316.)  That decision did not address the costs award, which Ajaxo had not challenged on appeal.

E*Trade's October 2015 memorandum of costs following the judgment denying a reasonable royalty thus claimed $221,317.53, of which $134,080.06 was "merely a

restatement of the costs claimed" under the 2008 judgment. E*Trade argued that the case history refuted Ajaxo's claim to be a prevailing party, since in "all proceedings subsequent to the 2006 remittitur, . . . neither party recovered any relief."

Ajaxo disputed E*Trade's characterization of multiple judgments. It argued that even if that were true, the prevailing party determination under Code of Civil Procedure section 1032, subdivision (b) is for an "action," which refers to the litigation viewed as a whole. Ajaxo reasoned that it "finds itself in procedurally the identical position it was in 2003" with a net monetary recovery of $1.29 million. Ajaxo maintained that it would be inequitable and contrary to the statute to strip Ajaxo of prevailing party status where it prevailed on liability on two causes of action and damages on one cause of action.

The trial court denied the motion to strike costs and granted-in-part the motion to tax costs, reducing the total cost award by about $8,300. Ajaxo separately appealed from the order granting E*Trade costs.

## II.    DISCUSSION

Ajaxo contends that the trial court erred in three main ways. First, by denying Ajaxo a reasonable royalty. Second, by denying Ajaxo's motion for a new trial. And third, by awarding costs to E*Trade. We examine the relevant analytical framework and Ajaxo's burden on appeal before turning to Ajaxo's specific contentions.

### A.    Framework to Assess a Reasonable Royalty Under the CUTSA

A reasonable royalty, as a monetary remedy under section 3426.3, subdivision (b), is simply "a court-determined fee imposed upon a defendant for his or her use of a misappropriated trade secret." (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1308.) As demonstrated by our discussion in *Ajaxo II*, a court " 'may order' " a reasonable royalty for the past use of a misappropriated trade secret " '[i]f neither damages [for actual loss] nor unjust enrichment caused by misappropriation are provable.' (§ 3426.3, subd. (b).)" (*Ibid*.) The statute limits payment of a reasonable royalty to "no longer than the period of time the use could have been prohibited." (§ 3426.3, subd. (b).)

28

The reasonable royalty "is an attempt ' "to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff.  By means of a 'suppositious meeting' between the parties, the court calculates what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred." ' " (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1308, quoting *Vermont Microsystems*, *Inc*. *v. Autodesk*, *Inc*. (2nd Cir.1998) 138 F.3d 449, 451.)[9]  The reasonable royalty thus approximates "the price that would be set by a willing buyer and a willing seller for the use of the trade secret made by the defendant."  (Rest.3d Unfair Competition (1995) § 45, com. g.)  "Because the primary concern in most cases is to measure the value to the defendant of what he actually obtained from the plaintiff, the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place."  (*University Computing Co*. *v*. *Lykes-Youngstown Corp*. (5th Cir.1974) 504 F.2d 518, 539 (*University Computing*).)  Where there is a "real-world 'comparable' close on point," the court may view that as the "starting point" for the hypothetical negotiation.

_____

[9] Because the CUTSA is derived from the Uniform Trade Secrets Act (Uniform Act) (Stats. 1984, ch. 1724, § 1, pp. 6252–6253), California courts consider case law from other jurisdictions applying similar sections of the Uniform Act.  (See *Altavion*, *Inc*. *v. Konica Minolta Systems Laboratory*, *Inc*. (2014) 226 Cal.App.4th 26, 41; *Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1305, fn. 6.)  The Uniform Act " 'was approved by the National Conference of Commissioners on Uniform State Laws in 1979 and adopted without significant change by California in 1984.' " (*Cadence Design Systems*, *Inc*. *v. Avant! Corp*. (2002) 29 Cal.4th 215, 221.)

Unlike other provisions of the CUTSA derived almost verbatim from the Uniform Act, the authorization for the reasonable royalty under section 3426.3, subdivision (b) departs from the Uniform Act by requiring that actual damages and unjust enrichment be "unprovable" before a royalty may be imposed.  (*Cacique*, *Inc*. *v. Robert Reiser & Co*., *Inc*. (9th Cir. 1999) 169 F.3d 619, 623; *Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1308.)  This difference pertains only to the circumstances in which a party may be eligible to receive a reasonable royalty, however, and does not limit our examination of case law from other jurisdictions related to the calculation of a reasonable royalty.

(*Oracle Am*., *Inc*. *v*. *Google Inc*. (N.D.Cal. 2011) 798 F.Supp.2d 1111, 1121.) The court may then adjust upward or downward for other comparable data points including, where appropriate, the *Georgia-Pacific* factors. (*Ibid*.)

The *Georgia-Pacific* factors originated in "a patent-infringement case whose hypothetical agreement framework for determining infringement damages has since been widely adopted . . . ." (*Microsoft Corp*. *v*. *Motorola*, *Inc*. (9th Cir. 2015) 795 F.3d 1024, 1040.) The decision "set out fifteen factors for courts to consider in arriving at a royalty rate the parties might have agreed upon in a hypothetical negotiation" set at " 'the time the infringement began.' " (*Id*. at p. 1041.) Though derived from a patent case, the *Georgia-Pacific* factors are commonly referenced in trade secret reasonable royalty discussions. (See, e.g., *02 Micro Intern*. *Ltd*. *v*. *Monolithic Power Systems* (N.D.Cal. 2005) 399 F.Supp.2d 1064, 1078 [granting reasonable royalty under the CUTSA after applying *Georgia-Pacific* factors].) This reflects a general trend of patterning trade secret damages after patent damages. (*Olson v*. *Nieman's*, *Ltd*. (Iowa 1998) 579 N.W.2d 299, 310 (*Olson*) ["Given the difficulty of assessing damages in trade secret cases, courts have frequently analogized damages in a trade secret action to those measures of damages usually employed in patent infringement cases"]; see Milgrim on Trade Secrets (2019) Aspects of Relief Available in Trade Secret Litigation § 15.02.) Both the parties and the trial court in this case recognized application of the *Georgia-Pacific* factors to the royalty analysis here.[10]

---

[10] The following are the 15 *Georgia-Pacific* factors considered by the trial court in this case, adjusted to apply to trade secret misappropriation:

"1. The royalties received by the [trade secret owner] for the licensing of the [trade secret] in suit, proving or tending to prove an established royalty.

"2. The rates paid by the licensee for the use of other [trade secrets] comparable to the [trade secret] in suit.

"3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

(continued)

As with any hypothetical inquiry informed by a range of evidentiary factors, the reasonable royalty offers no promise of mathematical precision. It is a purely theoretical measure, appropriate "[w]here no established royalty can be proved . . . ." (*Faulkner v. Gibbs* (9th Cir. 1952) 199 F.2d 635, 639.) Determination of a reasonable royalty is a question of fact. (*Ibid*.) It "rest[s] in the sound discretion of the [finder of fact] based upon a fair and impartial consideration of all the evidence." (*Olson*, *supra*, 579 N.W.2d at p. 310.) Some flexibility in the analysis is required to ensure that the difficulty of

"4. The [trade secret owner]'s . . . policy . . . to maintain his [trade secret] monopoly by . . . granting licenses under special conditions designed to preserve that monopoly.

"5. The commercial relationship between the [trade secret owner] and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

"6. The effect of selling the [trade secret] in promoting sales of other products of the licensee; the existing value of the invention to the [trade secret owner] as a generator of sales of . . . [non-trade secret items]; and the extent of such derivative or convoyed sales.

"7. The duration of the [trade secret's value] and the term of the license.

"8. The established profitability of the product made under the [trade secret]; its commercial success; and its current popularity.

"9. The utility and advantages of the [trade secret] over the old modes or devices, if any, that had been used for working out similar results.

"10. The nature of the [trade secret]; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used [it].

"11. The extent to which the infringer has made use of the [trade secret]; and any evidence probative of the value of that use.

"12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the [trade secret] or analogous inventions.

"13. The portion of the realizable profit that should be credited to the [trade secret] as distinguished from non-[trade secret] elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

"14. The opinion testimony of qualified experts.

"15. The amount that a [trade secret owner] . . . and a licensee . . . would have agreed upon (at the time the [misappropriation] began) if both had been reasonably and voluntarily trying to reach an agreement . . . ." (*Georgia-Pacific Corp.*, *supra*, 318 F.Supp. at p. 1120.)

assessing damages in a trade secret case does not prevent fair compensation to the trade secret owner for loss or injury caused by misappropriation. (*Id.* at p. 311.)

That flexibility is consistent with the policies underlying trade secret protection. (See *Ajaxo II*, *supra*, 187 Cal.App.4th at pp. 1311-1312 [authorization for a reasonable royalty protects innovation and standards of commercial ethics where a plaintiff fails to prove damages].) These guideposts are essential to bear in mind where, as here, there appears to be no set prescription for the trial court to follow in determining how to assess a reasonable royalty authorized by section 3426.3, subdivision (b).

**B.     The Appellate Burden in a Failure-of-Proof Case**

The parties present differing approaches to this court's review of the trial court's decision to deny a royalty. Because our analysis of the issues raised on appeal requires the appropriate degree of deference to the trial court's rulings (*San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 667), we examine the applicable standard of review. That standard "is determined by the nature of the challenged action of the trial court . . . ." (*El Dorado Meat Co. v. Yosemite Meat & Locker Service, Inc.* (2007) 150 Cal.App.4th 612, 617 (*El Dorado Meat*).)

Ajaxo's position seems to be that the trial court abused its discretion by failing to exercise its discretion as directed by this court in *Ajaxo II* and by overlooking the available evidence from which it "could have" reached a reasonable royalty. Ajaxo contends that the court's judgment was based on an "erroneous legal ruling," and that the existence of substantial evidence to support the resolution of any factual dispute does not support affirmance where the trial court failed to "actually perform[]" its factfinding function. (See *Kemp Bros. Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, 1477.)

E*Trade responds that Ajaxo has misstated the trial court's duty to exercise its discretion on remand from *Ajaxo II* and has misconstrued the standard of review.

32

We address the trial court's discretion to award—or deny—a royalty in the next section of the Discussion (part III.C.1.).  As for the standard of review, we find that Ajaxo's references to substantial evidence and to the trial court's supposed failure to perform its factfinding functions are misguided.  The "nature of the challenged action of the trial court" that dictates the applicable standard of review (*El Dorado Meat*, *supra*, 150 Cal.App.4th at p. 617) is the determination that Ajaxo failed to carry its burden to demonstrate entitlement to a reasonable royalty in any amount.  This court does not revisit the sufficiency of the evidence that *may* have been available to fulfill Ajaxo's burden of proof at trial.

In a case where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment."  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528; *Sonic Manufacturing Technologies*, *Inc. v. AAE Systems*, *Inc.* (2011) 196 Cal.App.4th 456, 466 (*Sonic Manufacturing*).)  Instead, "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law."  (*In re I.W.*, *supra*, at p. 1528.)  Specifically, we ask "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' "  (*Ibid.*, quoting *Roesch v. De Mota* (1944) 24 Cal.2d 563, 571.)

It is an onerous standard.  To succeed, Ajaxo must show that the evidence it relies upon compelled a finding in its favor.  In claiming, as it does, that "substantial evidence was entered at trial to support an award of reasonable royalties," Ajaxo fails to recognize its burden on appeal.  We moreover are guided by the general principle that the trial court's judgment is presumed to be correct on appeal, with "all intendments and presumptions in favor of its correctness."  (*Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769.)

33

**C.     It Was Within the Trial Court's Discretion To Deny Ajaxo a Royalty**

Ajaxo contends that the trial court applied an erroneous legal standard at several points in its reasonable royalty analysis.  It challenges the trial court's consideration of E*Trade's spoliation and unclean hands argument, the application of apportionment principles from patent law, and the exclusion of two of Ajaxo's three royalty models.  Ajaxo contends that even excluding Ajaxo's royalty models, there was ample evidence available for the trial court to devise a reasonable royalty.  We find no reversible error and no abuse of discretion.

### *1.     The Award of a Reasonable Royalty Pursuant to Section 3426.3, Subdivision (b) Is Discretionary*

Ajaxo's reasonable royalty argument is premised in part on this court's ruling in *Ajaxo II*.  It points to the closing paragraph of the opinion, in which we concluded that "since neither actual loss nor unjust enrichment is provable, the trial court had discretion pursuant to section 3426.3, subdivision (b) to order payment of a reasonable royalty.  The matter must be remanded to allow the trial court to exercise its discretion in that regard." (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1315.)  Ajaxo misconstrues the meaning of this passage to suggest that "on remand, the trial court was tasked with ordering payment of reasonable royalty" though "the amount for such royalty, obviously, was left to the trial court's discretion based on the evidence . . . ."

That is not correct.  The question in *Ajaxo II* was whether unjust enrichment was " 'provable' " within the meaning of section 3426.3, subdivision (b) where the jury had calculated no net enrichment.  (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1309.)  Finding that in such a situation unjust enrichment was not provable, we directed the trial court on remand to exercise its discretion pursuant to the statute.  (*Id*. at p. 1315.)

We need not repeat our analysis of the origins of the reasonable royalty provision of the CUTSA, which the California Legislature drafted independently of the Uniform Act from which the CUTSA was otherwise derived.  (See *Ajaxo II*, *supra*, 187

34

Cal.App.4th at pp. 1310-1311.) Simply put, the statute does not guarantee recovery of a royalty where actual losses and unjust enrichment are not provable but "provides only that the court 'may' award reasonable royalties in that situation." (*Id*. at p. 1313, quoting § 3426.3, subd. (b).) This comports with the plain language of the statute and with common principles of statutory interpretation. (See *California Correctional Peace Officers Assn. v. State Personnel Bd*. (1995) 10 Cal.4th 1133, 1143 [the word " 'may' " is ordinarily deemed permissive]; *Lo v. Lee* (2018) 24 Cal.App.5th 1065, 1071-1072 [" 'Ordinarily, when a statute provides a court "may" do something, the statute is permissive, not mandatory, and grants the court a discretionary authority.' "].) We therefore reiterate that the trial court had the discretion under section 3426.3, subdivision (b) to "determine 'what royalty, if any, would be reasonable under the circumstances.' " (*Ajaxo II*, *supra*, at p. 1313.)

### 2. *Ajaxo Fails to Accurately Portray the Record Evidence*

It is incumbent on Ajaxo as the appellant to summarize the facts fairly in light of the judgment. (*Western Aggregates*, *Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290; *Ajaxo I*, *supra*, 135 Cal.App.4th at p. 50.) Ajaxo's presentation of the record falls short of that standard. It refers almost exclusively to findings and evidence that support its position and has submitted appendices that contain only its own exhibits and testimonial designations admitted at the royalty trial. (E*Trade separately submitted additional appendices of its evidence and testimonial designations at trial.) By leaning heavily on what it describes as the "thorough and complete recitation of the factual and procedural history provided in the two previous appellate decisions," Ajaxo skates over the evidentiary deficiencies in its showing at the most recent trial and fails to grapple with the trial court's reasoned decision to deny a reasonable royalty. This is inconsistent with the appellant's burden to tailor its arguments " 'according to the applicable standard of appellate review.' " (*Sonic Manufacturing*, *supra*, 196 Cal.App.4th at p. 465.)

35

Put differently, Ajaxo emphasizes the evidence which theoretically could support a reasonable royalty but largely omits discussion of the evidence and reasoning underlying the trial court's findings and decision to deny a royalty. The question is not, as Ajaxo posits, whether the trial court "could have" calculated a reasonable royalty based upon the evidence from the first trial of E*Trade's counteroffer to Ajaxo and subsequent payment to Everypath for the wireless application technology. As stated in The question is whether the evidence required the trial court to do so. (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528; see *Roesch v. De Mota*, *supra*, 24 Cal.2d at p. 571 [explaining that where the appellants' ability to prove their case by a preponderance of the evidence was already "resolved against them" at trial, the question on appeal was "whether the evidence compelled the trial court to find in [the appellants'] favor"].) We conclude that it did not.

We devote the next sections (parts II.C.3.a.-e.) to examining Ajaxo's contentions of error arising from the trial court's treatment of Ajaxo's alleged role in evidence spoliation, its application of apportionment principles from patent law, its refusal to assess a royalty based on the available evidence or based on Ajaxo's value-added developer distribution model, and its exclusion of Ajaxo's other two royalty models for untimely disclosure. In the following sections of the discussion (parts II.D and II.E), we consider Ajaxo's motion for a new trial and the award of costs.

### 3. *The Available Evidence Did Not Compel a Reasonable Royalty Award*

Ajaxo challenges the trial court's decision to award nothing by pointing to evidence from the first and second trials, from which it argues the trial court could have devised a reasonable royalty. It argues that *Ajaxo II* "went so far as to identify" the evidence adduced during the second trial that could have been used to calculate a reasonable royalty. It contends that the trial court ignored this and the additional

36

evidence developed at the royalty trial and imposed concepts of stricter valuation from patent law that do not apply to trade secret cases.

*Ajaxo II* indeed stated that "[e]vidence of the negotiations between the parties pertaining to the licensing of Ajaxo's software and evidence of the price E*Trade paid for the license it obtained from Everypath could have served as a starting point for the trial court's estimate of what the parties would have agreed was a fair licensing price at the time the misappropriation occurred." (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1313.) That observation was accurate and remains so. But the existence of a starting point does not guarantee recovery of a royalty. (*Ibid.*)

The trial court framed its analysis properly. It recognized that the royalty rate "is typically determined by modeling a hypothetical negotiation" between the trade secret owner and trade secret user at the time the misappropriation began. It outlined factors that would influence a hypothetical "market place confrontation of the parties," including "similar license agreements between the parties or in the industry, anticipated profits, the trade secret's contribution to the product, the nature of the market, the parties' competitive positions, and the development costs of the same or similar trade secrets." (See *Georgia-Pacific*, *supra*, 318 F.Supp. at p. 1121.) And it acknowledged, consistent with *Ajaxo II*, that a trade secret owner's pre-misappropriation offer to license should be the " 'starting point' of any hypothetical negotiations analysis."

But the trial court encountered problems of proof that it found rendered impossible any fair and reasonable royalty assessment. For example, the trial court noted "that E*Trade could have obtained robust license rights, including a license to Ajaxo's trade secrets plus completed software and other services, for between $500,000 and $712,687, depending upon whether Ajaxo's original offer to E*Trade or one of E*Trade's counteroffers were to serve as the basis for calculating that license fee amount." Yet it found that "Ajaxo's destruction of evidence" and the lack of "clear definition . . . [of] Ajaxo's trade secret or any persuasive evidence of its independent economic value"

37

hindered the court's ability to identify the trade secret and apportion its value from the bundle of "substantially more valuable rights" that was the subject of the licensing discussions.

The trial court likewise considered the rate paid by E*Trade, as hypothetical licensee, for its use of comparable technology to the trade secret at issue. It explained that while E*Trade paid Everypath $30,000 per month for the wireless trading application "plus hosting and other services, to support 4,000 concurrent users," Koo's destruction of the Ajaxo software made it "impossible to apportion any part of the value of that service to the Ajaxo trade secret." The court reasoned that even apportioning the entire $30,000 monthly fee to the Ajaxo trade secret for three years "would yield a royalty of $1,080,000"—an amount less than what E*Trade already paid to Ajaxo in satisfaction of the prior judgment on the breach of contract claim. The court determined that any royalty that could be awarded would be offset by that amount.[11]

The trial court similarly found that "unproven, unprovable, and/or false factual assumptions" precluded calculation of a reasonable royalty based on Ajaxo's value-added developer distribution model. The court excluded the two other royalty models proffered by Ajaxo based on what it concluded was their "untimely disclosure and concealment during expert discovery."

Ajaxo disputes the trial court's key findings and contends they were based on erroneous legal premises. It also challenges the court's exclusion of the two royalty models, which left the court to consider only the value-added developer distribution model and other available evidence for the royalty analysis. We consider these intermingled issues as they relate to the trial court's rejection of a reasonable royalty.

---

[11] Ajaxo has failed to challenge the trial court's ruling regarding offset under the theory of precluding double recovery, raising it for the first time in its reply brief. We discuss the issue in more detail in our review of the trial court's denial of Ajaxo's motion for a new trial, *post*. (See Discussion, part II.D.b.)

38

*a. The Trial Court Did Not Abuse its Discretion in Deeming the Alleged Spoliation of Evidence and the Apportionment of Actual Trade Secret Value Relevant to Any Reasonable Royalty Award*

The trial court found that Ajaxo failed to proffer evidence adequate to define the trade secret and to assess its independent economic value or apportion that value from the technology bundle that was the subject of licensing discussions and potentially comparable transactions. This was based in part on the court's conclusion that during the course of litigation, Ajaxo "lost or destroyed" evidence of the trade secret which would have been "relevant to the royalty inquiry and important to a fair evaluation of Ajaxo's trade secret." The court reasoned that to derive a *reasonable* royalty from the available evidence required apportioning the value of the trade secret that E*Trade disclosed to Everypath. It found this was impossible because Ajaxo's destruction of evidence eliminated the source code and other documentation that would have allowed comparison of Wirelessproxy XO with other tools, like the Smart Agent toolkit licensed to Infocast and sublicensed by Infocast to Chong Hing. The court similarly concluded that apportionment was required to derive a reasonable royalty from Koo's value-added developer distribution royalty model, which the court found relied on numerous, unproven factual assumptions related to Everypath's alleged use of the Ajaxo trade secret.

Ajaxo argues that this approach was wrong. It contends that a source code analysis was never required to identify the nature of its trade secret, which was revealed through documentation and expert testimony in the first trial, as summarized in *Ajaxo I*, *supra*, 135 Cal.App.4th at pages 28 through 31. Ajaxo points to the description in *Ajaxo I* of Ajaxo's expert Earl Rennison, who "described in detail to the jury what he opined was the Ajaxo trade secret" and explained its independent economic value. (*Id.* at p. 35.) Ajaxo points out that this evidence—which for the first jury proved that Ajaxo was the owner of a trade secret—was produced and available to the trial court in devising a reasonable royalty.

39

Ajaxo relatedly contends that patent apportionment principles have no application here. Ajaxo refers to the trial court's rejection of Koo's royalty model in part because it assumed that the "entirety of the value" in the Infocast and Chong Hing license agreements for Ajaxo's Smart Agent toolkit was "attributable to the Ajaxo trade secret that E*Trade disclosed to Everypath." The trial court explained that "[a] reliable apportionment would require evaluating Ajaxo's Wirelessproxy XO and Smart Agent software, including its source code and Javadoc, to understand the differences between the misappropriated trade secret, the Smart Agent software, the KC Multimedia intellectual property, and everything else baked into the final 'Wirelessproxy XO' software that contained the trade secret." But instead of apportioning value between the Wirelessproxy XO trade secret disclosed to E*Trade and the Smart Agent toolkit later licensed to Infocast, the trial court found that Ajaxo "simply assigned the entire $700,000 value" of the Infocast contract to the misappropriated trade secret. It concluded that Ajaxo had "lost or destroyed" the evidence needed for reliable apportionment.

In drawing this conclusion, the trial court referenced apportionment principles commonly applied in patent disputes. The trial court reasoned that " '[t]he [trade secret owner] . . . must in every case give evidence tending to separate or apportion . . . the [trade secret owner]'s damages between the [trade secret] and [other] features, and such evidence must be reliable and tangible, and not conjectural or speculative.' " (Quoting *Garretson v. Clark* (1884) 111 U.S. 120, 121; *Uniloc USA, Inc. v. Microsoft Corp.* (Fed. Cir. 2011) 632 F.3d 1292, 1318; *Virnetx, Inc. v. Cisco Systems, Inc.* (Fed. Cir. 2014) 767 F.3d 1308, 1326.)

Ajaxo argues that applying these patent principles was erroneous and inconsistent with the emphasis of trade secret cases on flexibility in measuring damages—part of the reason for the reasonable royalty measure of damages under the CUTSA. Ajaxo further asserts that the trial court's embrace of source code review for apportionment and valuation purposes was unfair and skewed the equities in this case, since it was well

40

known there was no source code to be analyzed. This is especially true where, according to Ajaxo, E*Trade rejected an opportunity earlier in the litigation to review Ajaxo's then-existing Javadoc as irrelevant hearsay that did not reflect evidence of what was misappropriated in 1999. Ajaxo questions how the trial court could fail to comprehend the nature of the trade secret despite the evidence from the first two trials, jury findings, and conclusions of the reviewing court in *Ajaxo I* and *Ajaxo II*—none of which relied on source code or technically similar documentation.

We find nothing erroneous or contradictory in the trial court's application of apportionment principles to the reasonable royalty analysis. The derivation of these standards from patent cases has long been acknowledged: "[I]t is generally accepted that the proper measure of damages in cases of trade secret misappropriation is determined by reference to the analogous line of cases involving patent infringement." (*Bianco v. Globus Med., Inc.* (E.D. Tex. 2014) 53 F.Supp.3d 929, 937, citing *University Computing*, *supra*, 504 F.2d at p. 535.) When a plaintiff cannot establish specific injury and invokes the reasonable royalty as an alternative measure of damages, the goal is to measure the value of the trade secret to the defendant. (*University Computing*, *supra*, at pp. 535-536.) Several factors in the *Georgia-Pacific* framework direct the factfinder to ascertain the relative value ascribed to the invention or the portion of profits that may be credited to that feature. (*Univ. of Pittsburgh v. Varian Med. Sys.* (Fed. Cir. 2014) 561 Fed.Appx. 934, 947 ["[a] number of the *Georgia-Pacific* factors . . . require the jury to reward the inventor only for the value of his or her innovation"].)

Ajaxo contends that apportionment is incompatible with the "flexible and imaginative approach" to the problem of trade secret damages described in *University Computing*, *supra*, 504 F.2d at page 538. It argues that the court in *University Computing* did not discuss or cite the *Georgia-Pacific* factors but provided a simpler statement of nonexclusive factors relevant to the hypothetical negotiation of a reasonable royalty.

41

We find that apportionment, even where not explicitly discussed, is implicit in the reasonable royalty. That is, where "actual apportionment of profits" cannot be shown (*University Computing*, *supra*, 504 F.2d at p. 537), the reasonable royalty on a defendant's sales has the effect of "creating an apportionment of profits based on an approximation of the actual value of the infringed device to the defendant" (*ibid*.). Analogizing from the patent context, this applies equally where the misappropriated trade secret informs some but not all of a defendant's commercial process or product. (See *Univ. of Pittsburgh v. Varian Med. Sys.*, *supra*, 561 Fed.Appx. at p. 950 ["apportioning the profits between the infringer and the patentee according to the value of the improvement . . . is precisely what the *Georgia-Pacific* factors purport to do"].) The "flexible and imaginative approach to the problem of damages" (*University Computing*, *supra*, at p. 538) necessitated by the unique circumstances of each case and the difficulty of ascertaining trade secret damages does not preclude apportionment, which we find applies inherently to any approximation of " '[t]he actual value of what has been appropriated.' " (*Id*. at p. 537.)

The question remains whether the trial court nonetheless abused its discretion in concluding that a "reliable apportionment" required evidence of Ajaxo's Wirelessproxy XO source code and Javadoc to distinguish the components "baked into the final 'Wirelessproxy XO' software that contained the trade secret." To the extent the court's findings on this point were factual in nature (pertaining to the nature of Ajaxo's trade secret and destruction of evidence documenting the secret), we review those findings for substantial evidence (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 51), bearing in mind the baseline standard for reversal in this case hinges on Ajaxo's claim that the evidence effectively *required* the trial court to find a reasonable royalty. (See *In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) We review the admission of the underlying testimony and evidence for abuse of discretion. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.)

42

The trial court found that the items needed to establish the nature of the trade secret for purposes of the royalty analysis, including software, source code, and/or Javadoc source code documentation "no longer exist[ed] in any form."[12]  It found that "[a]ll printed copies of the source code and Javadoc were destroyed, and all electronic copies erased, lost, or destroyed by Ajaxo by no later than 2007."  And it held Ajaxo responsible for the destruction of this evidence after the conclusion of the first appeal in *Ajaxo I*, noting that Koo's "conflicting excuses for the loss of this data" were not persuasive given "compelling" expert testimony to the contrary from several computer forensic experts.  The court found that despite Koo's understanding of Ajaxo's obligation to preserve relevant evidence, in 2007 he smashed "to bits" Ajaxo's hard drive that was the only location that "either had contained or still contained the Wirelessproxy source code and Javadoc . . . ."  The court ruled that Ajaxo acted in bad faith in destroying its hard drive.

There is ample support in the record for these findings.  Ajaxo's contention that the trial court erred in considering E*Trade's "unclean hands" or spoliation arguments because they were rejected at other points in the litigation is without merit.  In the first trial, E*Trade asserted an affirmative defense of unclean hands based on Koo's destruction of certain electronic files and data residing on a server that Koo claimed had been infected with a virus.[13]  The jury rejected the defense, finding that E*Trade did not

---

[12] The trial court identified the sources of information that no longer existed at the time of the royalty trial as follows:  Ajaxo's Wirelessproxy XO software that implemented the trade secret; the "later" Smart Agent software; the "earlier" Wirelessproxy software belonging to KC Multimedia on which Wirelessproxy XO was based; all source code for all versions of the software; the "Javadoc" documentation of Java source code that explained its components and how they worked to the author and other programmers; all printed and electronic copies of the source code and Javadoc; and the prototype application that Ajaxo developed for E*Trade in 1999.

[13] The opinion in *Ajaxo I* does not discuss E*Trade's unclean hands defense, which was not an issue on appeal.  Ajaxo's destruction of evidence is nonetheless (continued)

prove by a preponderance of the evidence that Ajaxo acted with unclean hands. Given that finding, the trial court here properly limited its conclusions to "the numerous subsequent acts of destruction of all remaining evidence of Ajaxo's software" which comprised "the post-2003 destruction of evidence." The trial court focused on the destruction of Ajaxo's sole remaining server in 2007, which was the subject of extensive testimony at the royalty trial, summarized *ante* (part I.C.1.). Also at issue was Chun's prior testimony about the destruction of Ajaxo's financial records in 2007.

Contrary to Ajaxo's assertions, the spoliation issue was not put to rest in rulings before the 2008 trial.[14] The decision to exclude testimony related to evidence destruction from the trial on misappropriation damages reflected the court's determination at the time that missing source code evidence was not relevant to unjust enrichment. It did not determine the substantive "effect of any alleged spoliation of the evidence," as the court later explained in its order to proceed to the second phase of the royalty trial.

discussed in the context of a separate evidentiary issue involving Koo's communications with the FBI after he discovered unauthorized access to Ajaxo's server in September 1999 (shortly after Ajaxo demonstrated its technology for E*Trade). (*Ajaxo I*, *supra*, 135 Cal.App.4th at pp. 43-44.) Two years later, after the filing of this lawsuit, Koo apparently informed the FBI that Ajaxo's server may have been infected with a virus. (*Ibid.*) Consequently, "[a]ccording to Koo, the FBI advised him that he should 'reformat' the server's hard drive." (*Id*. at p. 43.) This resulted in the destruction of "all the electronic files and data that resided on the server pertaining to the E*Trade application of Ajaxo's technology as it existed in the fall of 1999." (*Ibid.*)

[14] Ajaxo's brief on appeal appears to conflate different motions and rulings by the trial court prior to the 2008 trial on damages. Ajaxo points to an April 2008 ruling by the discovery judge (Hon. Socrates P. Manoukian) rejecting a motion by E*Trade to augment its expert witness list and to take additional depositions, stating (incorrectly) that the ruling was on E*Trade's motion to terminate the litigation based on Ajaxo's destruction of a hard drive. However, this court's review of the record confirms that E*Trade did file a motion in April 2008 to terminate litigation, or in the alternative, for issue, evidentiary, and monetary sanctions based on that destruction of evidence. According to the arguments of counsel at the royalty trial, the trial court denied that attempt and excluded evidence of the destruction of Ajaxo's hard drive from the trial on misappropriation damages.

44

Ajaxo claims that the evidence adduced at the royalty trial on Koo's alleged destruction of evidence disproves any relevance to the royalty determination, because Koo testified that the server he hammered and recycled in 2007 did not contain source code connected to the E*Trade case or similar to that which Ajaxo's expert Rennison examined in forming his liability opinion during the first trial. This argument obliquely ignores the trial court's conclusion, based on having observed both Koo and Chun "testifying at length on multiple occasions, both in person and via videotaped depositions," that their credibility was compromised by significant contradictions in their testimony, leading to the inference that the development server "likely contained evidence that would have been unhelpful to Ajaxo and/or helpful to the defense in this trial and of invaluable assistance to the Court."

Indeed, the trial court reasonably found that Ajaxo's duty to prove "the value and amount of any royalty claimed" necessarily included "the nature and extent of the evidence (or lack thereof) available to the Court, and the defense, to evaluate the royalty claim." This was, simply, a relevance determination. Ajaxo fails to demonstrate that the only remaining electronic evidence documenting the misappropriated technology had no "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210). At a minimum, the evidence was relevant to compare Wirelessproxy XO's trade secret features to the other programs relied on in Ajaxo's royalty models, and to the capabilities of other wireless trading solutions available at the time. The trial court therefore did not abuse its discretion in admitting that evidence for the reasonable royalty analysis, nor in concluding that contradictions in the testimonial record undermined Ajaxo's credibility and supported the finding that its actions inhibited a fair royalty analysis.

45

*b. The Trial Court Did Not Abuse its Discretion in Refusing to Assess a Royalty Based on the Available Evidence*

We turn to the adequacy of the available evidence on the nature of the trade secret, independent of the royalty models and without source code or Javadoc documentation.

Ajaxo invokes the broad definition of "trade secret" under the statute (§ 3426.1, subd. (d)) to show that it proved its case during the first trial based on a combination theory of trade secret. It questions how that evidence—undeniably sufficient to support the jury finding of willful and malicious misappropriation of Ajaxo's trade secret (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 54), was insufficient to determine a royalty on E*Trade for its use of the misappropriated trade secret. For example, it argues that it urged the court in its closing brief to view its licensing negotiations with E*Trade as consistent with its subsequent negotiations with Infocast, which could have formed the basis of a royalty valuation.

This argument ignores Ajaxo's unvarying opposition to use of the E*Trade negotiations to establish valuation throughout the royalty trial, as well as the proof and reliability problems that undermine Ajaxo's reliance on the Infocast license as a hypothetical baseline (see part II.C.3.d.). What is more, it fails to address the trial court's conclusion that the evidence and testimony developed in the 2003 trial did "not define the trade secret, either, certainly not in a way that would allow a fair evaluation and comparison with other software for purposes of assessing a reasonable royalty."

The court found, for example, that certain features of the Wirelessproxy XO software did not comprise the trade secret because according to testimony in the original trial, they were in the public domain or in use by Everypath prior to the misappropriation. As for those features described in the first trial as trade secret, which included "particular solutions to specific problems with offering a wireless trading solution that would work with E*Trade's existing system, including the use of a number added to Internet addresses to 'defeat the cache,' techniques to maintain a 'session' between the wireless

46

user and E*Trade's server without the use of 'cookies,' and the addition of an unspecified 'Javabean' program to emulate E*Trade's use of Javascripts," the trial court found these descriptors insufficient "to actually define" the trade secret and value it for royalty purposes based on how it worked and its advantages over potential alternatives or competitors. It credited the testimony of E*Trade's software valuation expert, David Klausner, who opined that it was not possible to value trade secrets reflected in computer software without the source code. It also cited testimony from the first trial which established that source code was the only documentation of differences between Wirelessproxy XO and the Smart Agent toolkit (used as a proxy in Koo's royalty models), and that Ajaxo's expert at the first trial relied on his inspection of the then-existing Javadoc for his opinion that Everypath copied elements of the Wirelessproxy XO software in the Fall of 1999.

The trial court's reasoning is sound. Expert testimony established that the source code or related documentation would have enabled the court to differentiate the trade secret embodied in Wirelessproxy XO from predecessor technology owned by KC Multimedia, upon which Wirelessproxy XO was built, or from the SmartAgent Toolkit, which was built on top of Wirelessproxy XO. The source code similarly would have allowed the court to ascertain the extent to which the trade secret was used in the Everypath software deployed by E*Trade, or in the Everypath product sold to Everypath's other customers, and the length of time the trade secret remained unknown to competitors (other than Everypath) and entitled to protection. These considerations were appropriate for any reasonable approximation of the value of what E*Trade "actually obtained" from Ajaxo (*University Computing*, *supra*, 504 F.2d at p. 539) and "what the parties would have agreed to as a fair price for licensing" E*Trade "to put the trade secret to the use [it] intended at the time the misappropriation took place" (*ibid*.).

Because the trial court found the uncertainty was rooted in Ajaxo's destruction of the same documentation and electronic evidence that witnesses had acknowledged at

47

various points contained relevant information, the court did not abuse its discretion in harnessing Ajaxo—the party with the burden of proof supporting a reasonable royalty award—with the consequences of the evidence destruction.

> ### c. The Trial Court Did Not Abuse its Discretion in Rejecting a Reasonable Royalty Based on the Value-Added Developer Distribution Model

The trial court's ruling to exclude Ajaxo's royalty theories based on the enterprise direct use and end-user subscription models, discussed in the next section *post*, left only the value-added developer distribution model for consideration.

The model calculated a $24,160,000 royalty as the sum of a $700,000 developer's license—assessed to E*Trade as the hypothetical software developer for Everypath's use of the Ajaxo trade secret, plus 92 runtime sublicenses of $510,000 each—assessed to E*Trade at $255,000 each, as its 50 percent share for each deployment of the trade secret by Everypath to Everypath's customers. In other words, the value-added developer distribution model assessed a royalty based on E*Trade disclosing the trade secret to Everypath and Everypath allegedly implementing the trade secret in 92 customer contracts (independent of its contract to provide wireless trading capability for E*Trade) for a three-year period. Koo, testifying as Ajaxo's software licensing expert, explained that he derived the developer's license and runtime sublicense rates for the model from Ajaxo's licensing agreement with Infocast for the Smart Agent toolkit, and from the sublicensing agreement between Infocast and Chong Hing Securities.

The trial court rejected the value-added developer distribution model. It found the model dependent on numerous unproven or disproven factual assumptions, and flawed in that it sought a royalty for too long of a time period and for use of the trade secret by Everypath, rather than E*Trade, without establishing joint and several liability between the two defendants. Ajaxo challenges only a few aspects of the court's decision.

Ajaxo contends that the evidence supported using the Ajaxo-Infocast license and Infocast-Chong Hing sublicense as appropriate analogues for the hypothetical developer's license and runtime sublicense values in the model. The trial court found, however, that the $700,000 master-developer license to Infocast and $510,000 sublicense from Infocast to Chong Hing did not map reliably to a license value for the misappropriated trade secret.

This finding is supported by record evidence differentiating Wirelessproxy XO from the later-developed Smart Agent toolkit. Both Koo and Chun testified in depositions earlier in the litigation that the Smart Agent toolkit was a more developed product, never shown to E*Trade, which was "derived" from Wirelessproxy XO.[15] Chun explained that Smart Agent offered a complete "development environment" or "platform" with features comprising "more than the Wirelessproxy XO" and was thus "a new product." She said that any records describing what was added to Wirelessproxy XO to create Smart Agent would be found "in the source code itself." Koo testified that Smart Agent was an "evolution" of Wirelessproxy XO. And although both Koo and Chun testified several years later at the royalty trial that Wirelessproxy XO and Smart Agent were in fact "the same" technology, different only in name for marketing purposes, the court found these explanations lacked credibility. Perhaps in view of the material contradictions and numerous inconsistencies in each of their testimony, Ajaxo does not contest the court's credibility findings.

The same evidence supported the trial court's finding that the model failed to apportion the rates derived from the Infocast and Chong Hing agreements to reasonably reflect the Wirelessproxy XO trade secret content as a component of or precursor to the

---

[15] The relevant excerpts of deposition transcript were designated by E*Trade in the phase II royalty trial and were admitted as evidence. Those portions quoted above are from depositions taken in 2001 and 2002.

Smart Agent toolkit.  As we concluded *ante* (see part II.C.3.a.), Ajaxo has not demonstrated any error in the trial court's application of apportionment principles.  To the extent that the source code and other documentation might have enabled the finder of fact to assess the overlap or evolution between Wirelessproxy XO and Smart Agent, we conclude that the trial court did not err in considering the non-availability of that evidence and drawing related inferences.

The trial court also found that the Infocast agreement did not establish a standard rate for Ajaxo's Smart Agent software in the market, since it represented only a single licensing agreement at that price.  (See *Trell v. Marlee Electronics Corp.* (Fed. Cir. 1990) 912 F.2d 1443, 1446 ["A single licensing agreement, without more, is insufficient proof of an established royalty."].)  Ajaxo does not challenge the factual aspect of the court's finding, which is supported by the evidence of Ajaxo's other Smart Agent licensing agreements, several of which were terminated early by the other party and all of which generated significantly less than the $700,000 paid by Infocast.  Ajaxo nonetheless contends, citing *University Computing*, *supra*, 504 F.2d 518, that the trial court could have utilized the Infocast and Chong Hing license and sublicense rates because a single license agreement *can* establish a reasonable royalty rate.

Beyond the fact that the Infocast license was not a reliable analogue as discussed *ante*, Ajaxo's reliance on *University Computing* for this proposition is misplaced.  The case involved in relevant part a jury verdict awarding $220,000 against three defendants for misappropriation of trade secrets from a computer system for retail inventory control called AIMES III.  (*University Computing*, *supra*, 504 F.2d at pp. 528, 530.)  The Court of Appeals for the Fifth Circuit sustained the jury's verdict on misappropriation, noting that the $220,000 award was apparently derived from testimony about a single, unsuccessful licensing offer by the plaintiff to a third party for unrestricted use of the AIMES III system.  (*Id*. at pp. 543-544.)  Ajaxo construes the Court of Appeals' ruling as having held that a single license agreement can establish a reasonable royalty.  This is

50

inaccurate. In sustaining the award for misappropriation, the court addressed the defendants' contention that an unaccepted offer should not serve as evidence of value. (*Id*. at p. 545.) The court acknowledged the rationale behind excluding evidence of value based on an unaccepted offer (*ibid*.) but in the end determined that admission of the testimony was not improper under the specific circumstances of the case. (*Id*. at p. 546.) The court never addressed the question of whether a single, unaccepted licensing offer created an established market rate for the misappropriated computer system. (See *ibid*.) Since "cases are not authority for propositions not considered" (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 374; *City of Palo Alto v. Public Employment Relations Bd*. (2016) 5 Cal.App.5th 1271, 1319), we decline to adopt Ajaxo's strained interpretation of *University Computing*.

The trial court further concluded that the value-added developer distribution model was flawed due to its dependence on unproven assumptions about E*Trade's and Everypath's "use" of the trade secret. The court found "no evidence . . . that the trade secret(s) disclosed by E*Trade to Everypath were the same as the trade secret(s) used by Everypath, or that E*Trade's disclosure caused Everypath's use." It explained that Ajaxo argued and proved its liability case against Everypath separately from its case against E*Trade and never sought or obtained findings that would make E*Trade liable for Everypath's independent use of the trade secret. But Ajaxo contends that the trial record clearly established E*Trade's "use" of Everypath's wireless trading application, gained through E*Trade's misappropriation and disclosure to Everypath. Ajaxo points to language from *Ajaxo I* and *Ajaxo II*, which it contends establish E*Trade's use of the trade secret as the "law of the case."

Ajaxo's argument on this point misapprehends the trial court's finding, which pertains not to E*Trade's " 'use' " of Ajaxo's trade secret through the Everypath wireless trading application, but to the relationship between E*Trade's disclosure of the trade secret to Everypath and Everypath's subsequent, alleged use of that trade secret in

51

customer contracts entered after and independent of the E*Trade contract.  The

distinction is important because the value-added developer distribution model derives

most of its proposed $24 million royalty from Everypath's alleged use independent of

having provided wireless trading capability to E*Trade.  Even assuming that E*Trade's

implementation of the Everypath wireless trading solution established, by implication,

*E\*Trade's* use of the trade secret, there remains the inferential leap—which the trial court

found unsupported by evidence or findings in the record—that the same trade secret was

used by Everypath in the applications it subsequently sold to other customers, or that

E*Trade's disclosure caused Everypath's alleged use in those applications.[16]  It is

therefore unclear how E*Trade's alleged "use" of Ajaxo's trade secret through its

contracting for Everypath's wireless application services factors into the value-added

developer distribution model.[17]

---

[16] Ajaxo does not challenge the trial court's conclusions that key assumptions of the model pertaining to Everypath's use of the trade secret were *not* supported by the evidence.  Among these, the court found the assumption that Everypath deployed the trade secret technology in 92 customer contracts to be "unproven."  Several of these purported "customer" relationships were included in the model despite the fact that "[e]ven a cursory review" of the agreements with Everypath would have proven them incompatible, such as one contract that was for services *provided to* Everypath in which Everypath was the customer, another which extended services for only a three-month trial period, and others which included services other than software licensing and charged amounts that did not approximate the model's $510,000 figure.  According to testimony during the first trial from Everypath's then-CEO, the majority of Everypath's customer contracts received software unrelated to wireless trading or online financial services.  The court also found, based on testimony establishing significant overhauls to Everypath's core technology in the years immediately following the misappropriation of Ajaxo's trade secret, that Ajaxo failed to show that the software deployed to Everypath's alleged, 92 customers used or embodied the trade secret at all.

[17] As discussed in our summary of the royalty models (see *ante* part I.C.2.a.), Koo presented the value-added developer distribution model as the non-overlapping complement of the enterprise direct use model.  That model, which the trial court ultimately excluded, assessed a royalty based on E*Trade's direct use of the trade secret with its brokerage customers.

52

Ajaxo cites no record evidence to support its assertion that E*Trade used the Ajaxo trade secret through its choice of Everypath as its wireless trading partner. Ajaxo relies instead on passages from this court's decisions in *Ajaxo I* and *Ajaxo II*. We find that the referenced language does not establish E*Trade's use of the Ajaxo trade secret or any legal responsibility for Everypath's use, nor does it constitute the law of the case.

The passage that Ajaxo relies on from *Ajaxo I* describes the basis for the $1.29 million restitution award on the breach of contract cause of action against E*Trade. (*Ajaxo I*, *supra*, 135 Cal.App.4th at pp. 56-57.) In finding there was substantial evidence in the record to support the restitution award (*id.* at p. 57), the court in *Ajaxo I* explained the nature of the benefit to E*Trade: that "Ajaxo conferred a benefit on E*Trade by giving E*Trade Ajaxo's trade secrets and proprietary information because, ultimately, E*Trade received technology from Everypath that helped to keep it competitive" (*id.* at pp. 56-57). The quoted passage established only that enough evidence existed to support the award of contract damages against E*Trade for breach of the mutual nondisclosure agreement (NDA) based on a theory of unjust enrichment, due to the benefit gained from the disclosure. (*Id.* at p. 57.) As E*Trade rightly points out, Ajaxo did not try to prove a theory of use of the trade secret by E*Trade. The basis for the misappropriation claim was "Ajaxo's allegation that E*Trade breached the NDA . . . ." (*Id.* at p. 61.) The trial court granted nonsuit as to every theory of misappropriation that did not involve E*Trade's disclosure to Everypath. (*Id.* at p. 59, fn. 34.)

The *Ajaxo I* decision thus articulated the benefit to E*Trade as derived from E*Trade's *disclosure* of the misappropriated trade secret and subsequent use of technology that *Everypath* developed with information gained from the misappropriation. (*Ajaxo I*, *supra*, 135 Cal.App.4th at pp. 56-57.) The court explained the jury's liability findings in statutory terms, where, under the UTSA, "two different wrongdoers may be liable for misappropriation of a trade secret: one, a person who actually discloses a trade secret; and two, a person who acquires a trade secret from the discloser." (*Id.* at p. 66,

53

citing § 3426.1, subd. (b).) Far from holding E*Trade legally responsible for Everypath's misappropriation, the decision identified the evidence that supported the jury's special verdict as to Everypath, focusing primarily on the role of former E*Trade employee Dan Baca, a key figure in the technology exchanges with Ajaxo who had accessed Ajaxo's system without authorization, when he moved from E*Trade to Everypath in December 1999. (*Ajaxo I*, *supra*, at pp. 67, 68.) Liability as determined in the first trial was compartmentalized to E*Trade's appropriation of the trade secret and disclosure to Everypath, and Everypath's appropriation and use of the trade secret to fastrack the development of its wireless trading application. Each party in fact delineated the boundaries of its potential liability in relation to when Baca moved from E*Trade to Everypath in December 1999.[18]

*Ajaxo II* similarly does not determine that E*Trade "used" the trade secret or was responsible for Everypath's use. Liability was not at issue in the 2008 trial, because the remittitur in *Ajaxo I* called only for a retrial on the issue of damages. (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1306.) The trial court limited the scope of the second trial accordingly, denying a motion by Ajaxo to establish that E*Trade was jointly and severally liable for any unjust enrichment enjoyed by Everypath. (*Ibid*.) The reference to E*Trade's "use" of the trade secret cited by Ajaxo is in fact a summary statement describing the evidence E*Trade proffered to show that its wireless trading strategy resulted in a loss. (*Id*. at pp. 1302-1303.) E*Trade to that end "prepared a summary of revenue and expenses related to wireless trading for the period during which *E*Trade*

---

[18] The parties' positions limited any attempt by Ajaxo to ascribe joint liability between E*Trade and Everypath for Baca's role in appropriating the trade secret while employed at E*Trade and later at Everypath and resulted in the trial court granting an in limine motion on the subject. Ajaxo's counsel expressed no objection "[s]o long as Mr. Baca is on the clock with E*Trade, then it's E*Trade's responsibility. If he's on the clock for Everypath, then it's Everypath's responsibility. And that's the way the case can be tried."

*had been using* the misappropriated trade secrets." (*Id*. at p. 1303, italics added.) The quoted language is imprecise and not reflective of any findings of the appellate court.

The " 'law of the case' " doctrine, in any event, does not apply to determinations of factual questions in the prior appellate opinion but to rulings of law necessary to the decision of the case. The doctrine " 'deals with the effect of the *first appellate decision* on the subsequent *retrial or appeal*: The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.' " (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491, quoting 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 895, p. 928.) The California Supreme Court has clarified that "[t]he rule is not invoked where the sufficiency of the evidence necessary to sustain the judgment depends on the probative value or effect of the evidence itself, and the evidence in the second trial is changed." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 302.) Here, E*Trade's alleged use of the trade secret—to the extent Ajaxo contends it was previously established—constituted a factual question dependent on the probative value of the evidence. (See *ibid*.) Because this court did not analyze the issue of E*Trade's use or make a related legal determination, the trial court's finding that insufficient evidence linked E*Trade's disclosure of the Ajaxo trade secret to the use of that trade secret in Everypath's application licenses to customers did not contradict the law of the case.

To summarize, we find ample evidentiary support in the record for the trial court's findings, which together with the court's legal conclusions support its rejection of the value-added developer distribution model as a reliable and valid basis for determining a reasonable royalty. Ajaxo at most cites scant record evidence to support—let alone compel—contrary findings related to issues like the value of the hypothetical master-developer license for Wirelessproxy XO and the assessment of runtime sublicenses for Everypath's alleged uses of the trade secret with its other customers.

We conclude that the trial court did not abuse its discretion in rejecting a reasonable royalty based on the value-added developer distribution model.

> ### d. The Trial Court Did Not Abuse its Discretion in Excluding Expert Testimony on Royalty Theories That Were Not Timely Disclosed

Ajaxo challenges the trial court's exclusion of two of the three royalty models proffered by Koo in his capacity as expert witness. It asserts that E*Trade had ample notice of the royalty theories in question and was afforded the opportunity to explore those models during Koo's depositions. It contends that despite the record evidence of full and timely disclosure, the trial court excluded the royalty theories and eliminated viable methods to calculate a reasonable royalty, depriving it of a fair trial.

We review the decision to exclude the royalty theories and expert opinion for abuse of discretion. (*Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950 (*Boston*).) Ajaxo acknowledges the abuse of discretion standard but urges this court toward the traditionally "liberal policies of discovery . . . when reviewing decisions denying or granting discovery." (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 987.)

We agree that appellate courts should "keep the liberal policies of the discovery statutes . . . in mind when reviewing a decision *granting* discovery." (*Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161, 171.) But this principle carries less force when the decision under review is the denial of expert testimony for noncompliance with expert witness disclosure requirements. The expert witness disclosure requirements are intentionally rigorous. (See, e.g., *Bonds v. Roy* (1999) 20 Cal.4th 140, 146 [describing "strict procedures" for exchange of expert witness information, intended to allow time for experts to be identified and "the subject matter of their expected testimony . . . fully explored" before trial]; *Boston, supra,* 170 Cal.App.4th at p. 951 ["[T]he need for pretrial discovery is greater with respect to expert witnesses than ordinary fact witnesses because the opponent must prepare to cope with the expert's specialized knowledge"].)

56

Among the materials required in disclosure is the expert witness declaration providing "[a] brief narrative statement of the general substance of the testimony that the expert is expected to give." (Code Civ. Proc., § 2034.260, subd. (c)(2).) In *Bonds v. Roy*, the court considered whether an expert witness could be precluded from testifying at trial "on a subject whose general substance was not previously described in an expert witness declaration." (*Bonds v. Roy*, *supra*, 20 Cal.4th at p. 142.) The court interpreted the content requirement for the expert declaration as insurance that parties "give fair notice of what an expert will say at trial." (*Id.* at p. 146, interpreting former Code Civ. Proc., § 2034, subd. (f)(2)(B).) Noting "it is difficult to distinguish cases in which a party inaccurately describes the general substance of an expert's expected testimony from cases in which a party wholly fails to disclose an expert" (*Bonds v. Roy*, *supra*, at p. 147), the court reasoned that the exclusion sanction applies with equal force when a party fails to comply with the substantive aspect of the expert witness declaration. (*Id.* at pp. 148-149.)

Here, the trial court received Koo's expert testimony and opinions conditionally, subject to E*Trade's objections and later-filed motions to strike. The court reserved decision on the motion to strike filed after phase I of the royalty trial and reopened expert discovery. After the conclusion of the phase II trial, the court found that Ajaxo did not timely disclose Koo's expert opinions related to the enterprise direct use and subscription royalty theories. The court granted E*Trade's motion to strike expert testimony related to both royalty models.

We find no abuse of discretion in the trial court's assessment, which was well-supported by substantial evidence in the record of incomplete and untimely disclosure.

The model that Ajaxo disclosed during phase II expert discovery was the value-added developer distribution model, discussed *ante*, detailed in Koo's October 2014 expert report. The report described "a hypothetical licensing model that best fits the

use of the technology by E*Trade" including "hypothetical sublicenses to Everypath and its customers." It explained that the model used a "hypothetical owner/distributor relationship between E*Trade and Everypath" and noted that the licensing model "fits closely with an actual licensing transaction between Ajaxo and Infocast at the relevant time." It outlined the model's methodology and assumptions and calculated a royalty amount of $25,370,000. Koo's expert report described no other models. At his deposition, Koo stated that he had no other opinion, references, or calculations to add to the expert report.[19]

The next day, however, Koo stated in deposition that he viewed his testimony as a continuation of expert testimony he gave in phase I of the royalty trial. When pressed if there was "anything else" he was relying on that he had not identified, he revealed that he had reviewed E*Trade's public 10-K statements for the years 2000 to 2007 and might

---

[19] E*Trade's counsel addressed the subject of Koo's expert opinion multiple times during the deposition on November 17, 2014. For example, counsel asked Koo, "[A]re there any subject matters you expect to testify about other than what's in your expert report, Exhibit 1?" Koo answered that except as to what he might raise to respond to E*Trade's experts, "I don't have any other opinion to add to." E*Trade's counsel later asked, "So what if E*Trade says nothing at all? Do you have any opinions on this subject that you intend to offer?" Koo answered, "Then I already offer my opinion in the four corner [sic] of my report."

In another colloquy, E*Trade's counsel emphasized that it was asking "to know a hundred percent of everything that you're going to tell the Court is the basis for your opinion" and verified what Koo had previously stated he was relying on. Counsel continued, "Are there any pieces of—particular pieces of either testimony or documentary evidence in this case that are critical to your opinions, as you sit here today, as you intend to offer them to the trial court beyond what you've listed out in Exhibit 1?" Koo responded, "No." Shortly after, E*Trade's counsel asked if there were "any parts of the record that you looked at and relied upon in connection with preparing your opinions that you did not write down in your report, Exhibit 1?" Koo answered, "I said . . . , my opinion and the citings are all in this four corners of my report this morning. And that is still true." When asked if he had other "worksheets or spreadsheets that show your calculations" for the report, Koo answered "No. It is all being consolidated into this report, and that's it."

offer the "subscription model" articulated in phase I, using E*Trade's total retail customers reported in the 10-K statements. Koo acknowledged there was no mention of the subscription model in his expert report and broadly outlined a methodology based on Ajaxo's charges on its Smart Agent contract with Fidelity at a rate of 50 percent of "$30 per month per user." He explained that he had calculated a royalty in his head based on the subscription model but did not write it down and could not provide an estimate. Koo also clarified that he had not calculated a royalty based on the "enterprise model" disclosed in phase I, because it was "not actually being deployed by E*Trade" and was "not a fit."

Despite Koo's testimony representing that the "enterprise model" was not a fit for the case, Ajaxo's trial brief filed two days before the phase II bench trial included a $41.5 million proposed royalty using the enterprise direct use approach. Ajaxo's counsel agreed to a third day of deposition for inquiry into this latest disclosure. The deposition was held on the last business day before the phase II trial. Koo denied doing any additional work or formulating additional opinions since his earlier deposition. He explained that the formula to arrive at the $41.5 million enterprise direct model was "in [his] head" during his earlier deposition and maintained that E*Trade's attorneys had failed to question him to elicit a response related to that formula.

This evidence was more than sufficient to support the trial court's factual determination that Ajaxo failed to meet its expert disclosure obligation before the phase II trial. Ajaxo's claim that E*Trade had long been aware of each of Ajaxo's royalty models and "had simply failed to adequately explore them at the time of Mr. Koo's deposition" turns this obligation on its head. It was Ajaxo's duty, by the exchange deadline, to at least provide "the general substance" of testimony that its expert was expected to give. (Code Civ. Proc., § 2034.260, subd. (c)(2).) The evidence that Ajaxo relies on to show it complied amounts to little more than generic references to potential license models, contained in its written discovery responses, and to deposition testimony

from February 2012 (about one week before the phase I royalty trial began), in which Koo offered only slightly more detail about sources for his expert opinion for that phase of trial.[20]  In contrast with the value-added developer distribution royalty model disclosed in Koo's expert report before the phase II trial, these references provided no coherent insight into the "general substance" of the enterprise direct use and subscription models that Ajaxo presented at trial.  (Cf. Code Civ. Proc., § 2034.260, subd. (c)(2).)

Nor does the fact that E*Trade eventually obtained deposition testimony about all three royalty models mitigate the untimely nature of the disclosures.  An emergency deposition on the last business day before trial—prompted by a trial brief which announced a royalty model that Koo had previously disclaimed as "not a fit"—hardly fulfills the purpose of expert disclosure to "give fair notice of what an expert will say at trial."  (*Bonds v. Roy*, *supra*, 20 Cal.4th at p. 146.)  Fair notice allows the opposing party, in taking the expert's deposition, "to fully explore the relevant subject area . . . and to select an expert who can respond with a competing opinion on that subject area."  (*Id.* at p. 147.)  An expert opinion that exceeds the scope of the deposition testimony may be excluded "*if* the opposing party has no notice or expectation that the expert will offer the

---

[20] For example, Ajaxo points to special interrogatory No. 11, which asked Ajaxo to "[s]pecify with particularity the terms of the suppositious license that Ajaxo contends the Court should consider as the basis for a reasonable royalty award to Ajaxo."  Its response stated that "[v]arious reasonable royalty models may be relevant in determining the reasonable royalties due Ajaxo," then listed among the possibilities "a license based on a subscription model; a developer's license, both with and without, the ability to sublicense; runtime licenses; a license based on per user ability to access; a license based on per user use . . . ."

Ajaxo also points to Koo's deposition testimony in February 2012, in which he provided general responses about documents and testimony he had relied on in forming the opinion he would offer at the phase I trial.  Koo in response referenced the jury verdicts and appellate opinion, the "license[s] that Ajaxo issued to Infocast, to IWAPI, and to Fidelity, and also the corresponding brokerages," prior testimony about Ajaxo's "conduct in licensing," and the software distribution model used by Everypath which demonstrated that its conduct triggered "a minimum of 30 license[s]."

new testimony, or *if* notice of the new testimony comes at a time when deposing the expert is unreasonably difficult." (*Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780.) The evidence supports the trial court's conclusion that the timing of disclosure as to the end-user subscription and enterprise direct models fell short of this reasonable baseline.

We note in closing that even if we were to find the trial court's exclusion of the royalty models erroneous, the record does not support Ajaxo's contention that the decision deprived it of a fair trial. Ajaxo complains that the trial court cited prejudice to E*Trade as justification for its exclusionary ruling but referenced no evidence in support of that ruling. The standard for exclusion, however, is that the offending party "unreasonably failed" to comply with expert witness disclosure rules. (Code Civ. Proc., § 2034.300; see *Bonds v. Roy*, *supra*, 20 Cal.4th at pp. 148-149.) Prejudice may be inferred from the constraints on the opposing party's ability to adequately prepare to meet the late-disclosed expert opinion that will be offered at trial. (See, e.g., *Jones v. Moore* (2000) 80 Cal.App.4th 557, 565 [noting "it would be grossly unfair and prejudicial to permit" additional expert opinion at trial, when in deposition the expert affirmatively stated that the specific opinions given were the only ones he intended to offer].)

In addition, we find that any error in excluding testimony on those models was not prejudicial because the excluded models suffered from the same or similar reliability problems as the value-added developer distribution model. None of these models offered a viable method for calculation of a reasonable royalty. A judgment of the trial court may not be reversed for the erroneous admission or exclusion of evidence unless the error was prejudicial, resulting in a miscarriage of justice. (*Grail Semiconductor*, *Inc. v. Mitsubishi Electric & Electronics USA*, *Inc.* (2014) 225 Cal.App.4th 786, 799; Cal. Const., art. VI, § 13; Evid. Code, §§ 353, 354.) Accordingly, the trial court did not abuse its discretion or reversibly err in excluding the royalty theories.

61

*e.  Summary*

In sum, we find no abuse of discretion in the trial court's royalty analysis.  The court utilized the flexible analytical framework set forth in *University Computing* and expressed alternatively by applying the *Georgia-Pacific* factors.  It properly considered the negotiating history between Ajaxo and E*Trade, and E*Trade's contract with Everypath, for its hypothetical license negotiation but found the evidence was insufficient to assess a royalty due to Ajaxo's far-reaching, unproven or disproven assumptions and the destruction of source code and other documentary evidence.  The record evidence similarly demonstrated the unreasonableness of Koo's value-added developer distribution royalty model, which depended on exaggerated values and time frames based on further, unproven assumptions about the use of the trade secret in Everypath's customer applications and E*Trade's responsibility for Everypath's alleged, continuing use.  It was within the court's discretion to reject the value-added developer distribution model for failure of proof.  "The plaintiff fulfills its burden of proving damages by showing the misappropriation, the subsequent commercial use, and *introduces evidence by which the jury can value the rights the defendant has obtained*."  (*University Computing*, *supra*, 504 F.2d at p. 545, italics added.)  The court similarly exercised its discretion to exclude the other two royalty models based on their untimely disclosure.

We do not believe that the "flexible and imaginative approach" required to assess a reasonable royalty (*University Computing*, *supra*, 504 F.2d at p. 538) absolved Ajaxo as the aggrieved party of the burden to demonstrate the evidentiary basis for the reasonable royalty sought.

We find the reasoning of the appellate court in *Yield Dynamics*, *Inc*. *v*. *TEA Systems Corp*. (2007) 154 Cal.App.4th 547 helpful to illustrate Ajaxo's problematic insistence that the trial court could have and should have nonetheless derived a reasonable royalty.  *Yield Dynamics* involved an action for trade secret misappropriation brought against a company's former employee.  (*Id*. at p. 551.)  The court held a bench

62

trial and entered judgment for the defendants, finding in part that the plaintiff company had failed to establish that eight segments of allegedly misappropriated source code possessed the independent value necessary to constitute a trade secret. (*Id*. at p. 561.) The plaintiff company asserted on appeal that the evidence presented at trial supported " '[*a*]*s a matter of law* . . . a legal determination of trade secrecy.' " (*Id*. at p. 565.) The court rejected the plaintiff's overreach, explaining that the matter was not one in which "the evidence was so overwhelmingly one-sided that no reasonable fact finder could find against the complaining party." (*Id*. at pp. 565-566, citing *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 637; *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1666.) Rather, the court acknowledged that while the plaintiff cited numerous facts "that might *support* a finding of reasonable value" (*Yield Dynamics*, *supra*, at p. 566), it pointed to "no evidence that would *compel* a reasonable fact finder to reach such a finding" (*ibid*.). The court emphasized that the trial court "was entitled to find each of the cited facts equivocal, vague, or otherwise lacking in probative force." (*Ibid*.)

So too here, the trial court acted well within its authority to assess witness credibility, weigh the probative value of the evidence and reject unreliable evidence, draw reasonable inferences from gaps in evidence, and exclude improperly-disclosed expert opinion. While certain evidence in the record might have served as a starting point for calculation of a reasonable royalty, Ajaxo's combined overreach and failure to support its claims with reliable evidence in no way compelled a reasonable royalty award.

### D.  The Trial Court Did Not Err In Denying Ajaxo a New Trial

Ajaxo challenges the trial court's order denying Ajaxo a new trial on two independent grounds—the first related to application of the *Georgia-Pacific* factors, and the second related to the refusal to award Ajaxo any reasonable royalty.[21]

The applicable law and standard of review remain as articulated in *Ajaxo I*. There we explained that "a motion for a new trial is a new and independent proceeding, in which the trial court can reweigh the evidence and reevaluate the credibility of the witnesses. The trial court is authorized to disbelieve witnesses and draw inferences from the evidence contrary to the inferences drawn by the jury." (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 46.)  The court may grant a new trial based only on statutory grounds "materially affecting the substantial rights of" the aggrieved party. (Code Civ. Proc., § 657; see *Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 899 [power of trial court to grant a new trial may be exercised only by following the statutory procedure].)  The grounds cited by Ajaxo in its motion included "1. [i]rregularity in the proceedings of the court, . . . or any order of the court or abuse of discretion by which either party was prevented from having a fair trial. [¶] . . . [¶] 5. [e]xcessive or inadequate damages. [¶] . . . [¶] [and] 7. [e]rror in law, occurring at the trial and excepted to by the party making the application." (Code Civ. Proc., § 657.)

We review the order denying a new trial for abuse of discretion (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 46) but make an "independent determination" based on "the entire record, including the evidence" as to whether the asserted error was prejudicial. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872.)

---

[21] Although an order denying a new trial is not directly appealable, we may review it after the final judgment as an order substantially affecting the rights of the parties. (Code Civ. Proc., § 906; *Ajaxo I*, *supra*, 135 Cal.App.4th at p. 46, fn. 25.)

### a. The Court Did Not Err in Applying the **Georgia-Pacific** *Factors*

Ajaxo contends that the trial court's erroneous application of the *Georgia-Pacific* factors for determining a reasonable royalty deprived it of a fair trial. It asserts error as to 10 of the 15 factors considered by the trial court. Most of the asserted errors are supported only by conclusory statements lacking any citation to the record for support. Many also repeat contentions raised and addressed *ante*. We briefly address the main points that Ajaxo raises.

The first two *Georgia-Pacific* factors relate to royalties received by the patent owner tending to prove an established royalty, and rates paid by the licensee for the use of other patents comparable to the one in suit. (*Georgia-Pacific*, *supra*, 318 F.Supp. at p. 1120.) Ajaxo points to the evidence that it contends established the license fee through Ajaxo's transactions with third parties like Infocast in the time frame close to the misappropriation by E*Trade. As explained above, the trial court did not abuse its discretion in finding that Ajaxo's license to Infocast for the Smart Agent toolkit failed to establish a reasonable royalty rate for Wirelessproxy XO. Ajaxo advances no new arguments to the contrary.

Nor does Ajaxo challenge the trial court's findings as to the second factor, in which it looked to the $30,000 monthly rate paid by E*Trade, as the hypothetical licensee, to Everypath, for the wireless trading capability plus hosting and other services, as a rate paid for use of a similar trade secret. The court concluded that apportioning the $30,000 monthly rate for use of the Ajaxo trade secret was impossible because, as discussed *ante*, Ajaxo never established that Everypath used the Ajaxo trade secret in the software it provided to E*Trade or continued using that trade secret over several years as its software underwent major revisions. These factual findings are supported by the record. In contrast, Ajaxo's assertion that the trial court disregarded evidence of five years of use of the Ajaxo trade secret by E*Trade and Everypath is entirely unsupported

65

by any citation to evidence in the record. Most notably, Ajaxo effectively fails to challenge the trial court's conclusion that even if it had attributed the entire $30,000 monthly fee to the Ajaxo trade secret, the royalty yielded would be less than what Ajaxo already recovered from E*Trade for breach of the nondisclosure agreement—thereby precluding further recovery. (We discuss Ajaxo's possible forfeiture of this issue on appeal in more detail *post* (part II.D.b.).)

The fourth *Georgia-Pacific* factor relates to the licensor's policy to maintain its patent monopoly by licensing use of the invention only under conditions designed to preserve the monopoly. (*Georgia-Pacific*, *supra*, 318 F.Supp. at p. 1120.) Ajaxo contends that the trial court fundamentally misunderstood the nature of the trade secret by focusing on Ajaxo's destruction of the source code rather than its efforts to protect the "blueprint" which was the subject of the misappropriation. We find no error in the trial court's interpretation of this factor, which simply deemed the factor neutral due to the fact that while Ajaxo sought to protect its trade secret—such as by requiring potential licensees to sign nondisclosure agreements—it simultaneously failed to preserve the status of that secret by destroying its only copy of the source code that could be used to document its utility and worth.

The fifth *Georgia-Pacific* factor addresses the commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory or line of business. Ajaxo contends that the trial court erred in considering only that E*Trade and Ajaxo were not competitors, rather than acknowledging that E*Trade misappropriated the trade secret to Everypath, which was a direct competitor of Ajaxo. We agree with Ajaxo that E*Trade's disclosure of the trade secret to Ajaxo's competitor was a relevant consideration under this factor. However, Ajaxo does not demonstrate how the court's failure to consider the potential implication of E*Trade's disclosure to Ajaxo's market competitor affected the overall royalty analysis, considering the trial

66

court's well-supported findings that Ajaxo's failure to carry its burden to establish a reasonable royalty.

The seventh *Georgia-Pacific* factor pertains to the duration of the patent and the term of the license. (*Georgia-Pacific*, *supra*, 318 F.Supp. at p. 1120.) The trial court interpreted this as the duration of time the trade secret had value, which it found was six months based on E*Trade's ability to develop a wireless application in-house in that time. Ajaxo claims there was no evidence to support this finding, and that the only "credible" evidence was that E*Trade used Everypath's services for five years. Contrary to Ajaxo's conclusory assertion, which it again fails to support with any citation to the record, the trial court's finding was supported by substantial evidence, including testimony at the royalty trial by E*Trade's software valuation experts Lloyd and McFarlane, as well as the testimony of E*Trade's software development expert in the second trial in 2008.[22] Moreover, while it is not disputed that E*Trade continued using Everypath's services until the end of 2005, Ajaxo fails to acknowledge that this fact alone demonstrates nothing about use of the trade secret, as determined by the trial court.

The eighth *Georgia-Pacific* factor relates to the established profitability, commercial success, and popularity of the product made under the patent. (*Georgia-Pacific*, *supra*, 318 F.Supp. at p. 1120.) Ajaxo contends that the trial court

---

[22] Terry Lloyd opined that Ajaxo's trade secret had a "short economic life" based on the time required for others to develop their own front-end wireless solutions. Bruce McFarlane identified the failure to limit damages to the head-start period as among the critical flaws in Ajaxo's proposed royalty models. He explained the relevance of a trade secret's economic lifespan to the royalty analysis, noting "the additional cost that a licensee would incur to acquire essentially the same functionality, . . . to do it itself or buy from someone else represents an economic cap on what that licensee would be willing to pay for a license to that technology." William Beardsley, who testified as E*Trade's expert in software development projects in the 2008 trial on misappropriation damages, opined that based on E*Trade's technology and engineering capabilities at the time, it could have developed its own wireless trading capability in six months using four engineers.

erred in assessing this factor based on the failure of E*Trade's wireless trading business during the relevant period, and the broader failure "industry-wide" of companies providing wireless trading services at the time, most of which, like Everypath, eventually went out of business. It argues that E*Trade's or any other company's lack of established profit from the trade secret technology is irrelevant to the question of liability for a reasonable royalty. In support, it cites authority that an infringer's lack of profit does not preclude recovery of a reasonable royalty. (See *Cawood Patent* (1876) 94 U.S. 695, 710 ["In settling an account between a patentee and an infringer of the patent, the question is, not what profits the latter has made in his business, . . . but what advantage has he derived from his use of the patented invention."]; § 3426.3, subd. (b) [authorizing a reasonable royalty under the CUTSA when neither damages nor unjust enrichment are provable].)

Ajaxo's argument confuses the relevance of the profitability factor set forth in *Georgia-Pacifc* with the notion of profitability as a prerequisite to recovery of a reasonable royalty. The latter would not be correct under the CUTSA; but that is not what occurred here. Rather, the trial court properly considered the profitability of wireless trading at the time as one among many considerations that might increase or decrease the amount of a reasonable royalty. Ajaxo's assertion in its reply brief that it "appears to be the case" that the trial court found the lack of profitability to preclude an award is entirely unsupported.

Ajaxo further argues that consideration of profitability or commercial success is not applicable here because its trade secret represented early-stage and unique technology. As E*Trade points out, the trial court struck Koo's opinion about the uniqueness of the Ajaxo trade secret, and Ajaxo has not contested that ruling on appeal. But even assuming the trial court had adopted Ajaxo's characterization of the trade secret based on evidence of Ajaxo's ability to demonstrate secure wireless trading capability for E*Trade at the time of the misappropriation, that fact would not negate the applicability of the eighth *Georgia-Pacific* factor to the determination of a reasonable royalty.

68

Ajaxo's depiction of the uniqueness of the function conferred by its trade secret in fact aligns more closely to the ninth and tenth *Georgia-Pacific* factors. Factors eight and nine pertain to the utility and advantages of the invention over any other modes or devices, its nature, the character of the commercial embodiment as owned and produced by the licensor, and the benefits to those who have used the invention. (*Georgia-Pacific*, *supra*, 318 F.Supp. at p. 1120.) Ajaxo contends that the trial court improperly ignored findings from the previous trials establishing the unique advantages of Ajaxo's solution over the competition, including that there were no other systems available in 1999 that provided a front-end wireless trading solution.

Fundamentally, this argument is no different from Ajaxo's repeated attempts to argue the sufficiency of the evidence supporting its version of the facts. Ajaxo relies on factual findings pertinent to the decisions in *Ajaxo I* and *Ajaxo II* while ignoring substantial evidence presented at the royalty trial which showed that Ajaxo had substantially overstated its value proposition for the trade secret. Given testimony and evidence that E*Trade could independently develop a complete, wireless trading system in six months for $400,000 to $1 million and that the rapid advent of comparable, back-end solutions limited the value of Ajaxo's purportedly unique, front-end solution, we find no contradiction in the trial court's conclusion.

The 12th and 13th *Georgia-Pacific* factors relate to the portion of the profit or selling price that may be customary in the business to allow for use of the invention or of analogous inventions, and the portion of realizable profit that should be credited to the trade secret as distinguished from non-trade secret elements or improvements added by the infringer. (*Georgia-Pacific*, *supra*, 318 F.Supp. at p. 1120.) Ajaxo contends that the trial court erred in finding there was no evidence of a customary price in the market for the trade secret, as compared to pricing for a complete, working software solution like that sought by E*Trade. It points to the negotiations between Ajaxo and E*Trade, which suggest a licensing price for the trade secret between $400,000 and $860,000. Ajaxo also

69

contends that the court erred in considering, as a measure of the realizable profit attributable to the trade secret, the jury's finding in the 2008 trial that E*Trade had lost money on wireless trading. Ajaxo urges that "an infringer's profitability should not be considered" in calculating a reasonable royalty.

We agree with Ajaxo insofar as the negotiations with E*Trade may have been relevant as a "starting point" to discern what would be customary in the business for use of a wireless trading architecture like Wirelessproxy XO. But as determined by the trial court, the evidence ultimately relied upon by Ajaxo to establish the royalty it claimed was so far removed from these amounts and was derived from complete software solutions like the Smart Agent toolkit, which included new and added features, that it rendered impossible any determination of trade secret value as apportioned from the total package. The court therefore did not err in concluding that Ajaxo failed to demonstrate a customary price in the market for the trade secret.

Ajaxo lastly fails to support its assertion that an infringer's profitability should not be considered in calculating a reasonable royalty. Nothing in *Georgia-Pacific* limits that factor to circumstances in which realizable profits might be ascertained based solely on pre-infringing or non-infringing uses of the invention. To the contrary, the court expressly rejected the argument that infringing profits were irrelevant to the reasonable royalty inquiry. (*Georgia-Pacific*, *supra*, 318 F.Supp. at pp. 1122-1123.) It explained that the hypothetical licensor's inability to prove lost profits as a measure of damages does not preclude subsequent reliance, as a factor in the reasonable royalty inquiry, on the infringing party's "reasonably anticipated profits . . . ." (*Id*. at p. 1123.) Accordingly, the trial court did not err in noting that profits did not materialize from E*Trade's implementation of wireless trading in the years following its appropriation of the Ajaxo trade secret. This *Georgia-Pacific* factor moreover necessitates reasonable apportionment of the "realizable profit that should be credited" (*id*. at p. 1120) to the trade secret as distinguished from other features or improvements of the product,

70

requiring proof that the trial court reasonably concluded Ajaxo had eliminated through its destruction of evidence.

We conclude that the trial court did not commit errors of law in construing and applying the guidance of the *Georgia-Pacific* factors. To the extent the evaluation of individual factors required the court to make factual findings and draw inferences from the record, we find that substantial evidence supported those determinations.

### b. The Trial Court Did Not Err in Its Award of Damages

Ajaxo separately contends that the trial court committed prejudicial error in refusing to grant a new trial on the ground of inadequate damages.

The statutory standard for granting a motion on the ground of inadequate damages is limited to circumstances in which the trial court "after weighing the evidence . . . is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (Code Civ. Proc., § 657.) Here, the trial court *denied* the motion for a new trial on that ground. While we have not found a case articulating the standard of review applicable to the denial of the motion for a new trial on the ground of inadequate damages, we take guidance from the general principles of review related to damages.

"The power of an appellate court to review the trier of fact's determination of damages is severely circumscribed. An appellate court may interfere with that determination only . . . where the award is so out of proportion to the evidence that it shocks the conscience of the appellate court." (*Uva v. Evans* (1978) 83 Cal.App.3d 356, 363-364, citations omitted; see *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507 [distinguishing the powers and duties of a trial judge in ruling on motion for new trial from that of the appellate court, which can interfere on the ground the judgment is excessive "only . . . [when] the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption"].) We thus consider whether

71

the trial court's refusal to award a reasonable royalty, in light of the evidence and reasonable inferences therefrom (Code Civ. Proc., § 657) was "totally unconscionable and without evidentiary justification." (*Uva v. Evans*, *supra*, at p. 364; accord *Johnson v. Stanhiser* (1999) 72 Cal.App.4th 357, 361.)

The trial court stated in its order denying the motion for a new trial that Ajaxo had not demonstrated insufficiency of damages, and moreover that the court had exercised its discretion to deny reasonable royalties "for numerous separate and independently sufficient reasons" set forth in its statement of decision. Ajaxo argues that the court's refusal to award a reasonable royalty in any amount was unconscionable because substantial evidence was entered at trial to support a royalty award. It specifically points to the value-added developer distribution model, which it contends supported at its "high end" a royalty of about $25 million, while the licensing agreement between E*Trade and Everypath supported at the "low end" a royalty derived from the $30,000 monthly fee.

In a nutshell, the overarching conclusion of the trial court in denying a reasonable royalty was that any determination of a royalty would be the result of assumption and speculation. Ajaxo's efforts to direct this court toward evidence in the record which it contends supports an alternative view is unavailing. Aside from the trial court's largely appropriate treatment of the individual *Georgia-Pacific* factors, we find the court's findings—both evidentiary and factual–substantially supported its refusal to award a royalty. These findings ranged from Ajaxo's reliance on unproven assumptions underlying Koo's value-added developer distribution model, to its destruction of trade secret evidence important for value estimation and apportionment, to the contradictory testimony of its key witnesses. As E*Trade correctly points out, the alleged existence of substantial evidence that theoretically might have supported a different conclusion by the trier-of-fact is insufficient to compel a different conclusion.

Ajaxo raises three arguments in reply. First, it points to the appellate determination following the first trial that the evidence adduced at trial was sufficient to

support an award of damages to Ajaxo for the misappropriation. (*Ajaxo I*, *supra*, 135 Cal.App.4th at pp. 63-64.) Ajaxo claims that the same evidence was before the trial court here, as was additional evidence of third-party licensing negotiations and the Infocast license. This is a circular pattern of reasoning founded on evidence in the record that theoretically might have supported a reasonable royalty award. We need not rehash again this erroneous framing of the issue on appeal.

Second, Ajaxo attacks the trial court's conclusion that any royalty amount the evidence could have supported must be offset by the $1.29 million that Ajaxo recovered on its breach of contract claim. It argues that this determination, which contributed in part to a refusal to award a reasonable royalty, is contrary to California's primary right doctrine, to the implied holding of *Ajaxo I*, and to the result in other trade secret cases involving claims for both misappropriation and breach of contract. Ajaxo offers scant citation to authority and no argument or analysis to explain the asserted error.

We decline to consider this line of argument, which Ajaxo raises for the first time in its reply brief on appeal and which it did not raise before the trial court in its motion for a new trial.[23] Courts generally "will not consider points raised for the first time in a reply brief for the obvious reason that opposing counsel has not been given the opportunity to address those points [citations], particularly when the plaintiff[] also failed to raise such issue before the trial court." (*REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489, 500; see *People v. Tully* (2012) 54 Cal.4th 952, 1075 ["arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party"]; *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10

---

[23] The only mention we have found of offset in Ajaxo's memorandum of points and authorities in support of its motion for a new trial is a fragmented statement suggesting that the judgment against Everypath is an unsatisfied default judgment that has no relevance in offsetting any damages against E*Trade. The unsatisfied default judgment against Everypath, of course, is not the basis for the trial court's ruling on offset.

73

["Obvious reasons of fairness militate against" the court considering a poorly developed and untimely argument raised in the reply brief].) Ajaxo's silence on this point up until the reply brief stands out, because duplication of damages was among the issues disputed by the parties before phase I of the royalty trial, including by Ajaxo in its trial brief at that time, and because the trial court addressed it in some detail in its written statement of decision. We find that the issue has not been adequately raised, despite the clear opportunity to do so earlier, and so we need not address it further. (*Bunzl Distribution USA*, *Inc*. *v*. *Franchise Tax Bd*. (2018) 27 Cal.App.5th 986, 998.)

Third, Ajaxo contends that the decision to award nothing to Ajaxo was unconscionable because it deprived Ajaxo of redress for E*Trade's 20-year-old willful and malicious misappropriation, deprived Ajaxo of a right to punitive damages, exonerated E*Trade of any meaningful censure for its wrongdoing, deprived Ajaxo of the ability to recover its attorney's fees and expert witness costs, and potentially exposed Ajaxo to a significant costs bill. In short, Ajaxo contends that the trial court's decision to decline a reasonable royalty award under the circumstances of this case and despite sufficient evidence in the record to award damages for misappropriation is shocking to the conscience and subversive of substantial justice.

We understand Ajaxo's posture over the outcome of the royalty trial. The trial court's decision to *not* award Ajaxo a reasonable royalty for the willful and malicious misappropriation of its trade secret by E*Trade deprived Ajaxo of the recovery it anticipated after this court's decision in *Ajaxo II*. That anticipation, as discussed *ante*, was premised on Ajaxo's misinterpretation of the direction to the trial court on remand.

The contention that the trial court acted unconscionably in declining to award a reasonable royalty similarly stems from Ajaxo's misguided expectation at the outset of the royalty proceedings that the trial court's task was to order payment of reasonable royalty, with only the amount for such royalty left to the trial court's discretion based on the evidence. The court's task instead was to exercise its discretion pursuant to

74

section 3426.3, subdivision (b). (*Ajaxo II*, *supra*, 187 Cal.App.4th at p. 1315.) Having found that it was within the trial court's discretion to deny Ajaxo a royalty (part II.C.), and because Ajaxo has not otherwise shown an abuse of discretion in the trial court's evidentiary rulings or findings regarding Ajaxo's failure of proof to establish a reasonable royalty based on reliable, non-speculative evidence, we find no basis upon which to conclude that the decision to deny a reasonable royalty to Ajaxo was out of proportion to the evidence or shocking to the conscience of the appellate court. (Cf. *Uva v. Evans*, *supra*, 83 Cal.App.3d at pp. 363-364; see *Seffert v. Los Angeles Transit Lines*, *supra*, 56 Cal.2d at p. 507 [appellate court interferes on the ground the judgment is excessive "only . . . [when] the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption"].)

We are also not convinced that Ajaxo has suffered an egregious or unconscionable unfairness in the manner contended. It has had its proverbial day in court—prolonged across three trials and three appeals—out of which it secured a jury verdict in its favor and an award of $1.29 million in damages on its breach of contract cause of action for E*Trade's breach of a mutual nondisclosure agreement. The jury's liability findings against both E*Trade and Everypath enabled Ajaxo, on remand from the first appeal in *Ajaxo I*, to independently pursue damages against both companies for the misappropriation of Ajaxo's trade secret. The fact that it was unable to prove net damages for unjust enrichment in the 2008 damages trial or entitlement to a reasonable royalty in the last phase of trial does not translate to unconscionable unfairness. Nor does the fact that it obtained a $90 million default judgment against Everypath have any bearing, either way, on the propriety of the trial court's decision.[24]

---

[24] The record shows the amount of Ajaxo's default judgment against Everypath comprised $60 million in compensatory damages—attributed at the prove-up to a combination of venture capital funding received by Everypath during the relevant period, (continued)

75

We conclude that Ajaxo has not demonstrated an abuse of discretion in the trial court's denial of its motion for a new trial under Code of Civil Procedure section 657.

## E. The Trial Court Did Not Err in its Prevailing Party Determination and Costs Award

Ajaxo's final contention is that the trial court erred in designating E*Trade the prevailing party. It argues that although it recovered no relief on its cause of action for misappropriation, it obtained a "net monetary recovery" in the suit against E*Trade and therefore is the prevailing party within the meaning of Code of Civil Procedure section 1032, subdivision (a)(4). Yet the court determined that E*Trade was the prevailing party with respect to the judgment and denied Ajaxo's subsequent motion to vacate or amend the judgment relative to the issue of costs. Ajaxo contends that the court erred as a matter of law by failing to comply with the plain language of the statute based on the undisputed facts of the suit and judgment.

E*Trade responds that the trial court properly found it to be the prevailing party, as a "defendant where neither plaintiff nor defendant obtains any relief . . . ." (Code Civ. Proc., § 1032, subd. (a)(4).) According to E*Trade, Ajaxo's "net monetary recovery" based on the breach of contract damages award after the first trial and affirmed in *Ajaxo I* is not determinative because it already resulted in a separate final judgment and costs award after the remittitur following *Ajaxo I*. Ajaxo filed an acknowledgment of E*Trade's satisfaction of that judgment in July 2006. E*Trade argues that it would be contrary to the statutory scheme to order costs as a matter of right based on Ajaxo's recovery on the judgment in 2003 resulting from the breach of contract cause of action, despite Ajaxo having recovered nothing from the next decade of litigation on the misappropriation cause of action.

and the increase in Everypath's business valuation after the taking of the trade secret, and $30 million in exemplary damages.

76

"Generally, a trial court's determination that a litigant is a prevailing party, along with its award of fees and costs, is reviewed for abuse of discretion." (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) To the extent the issue presents a question of statutory interpretation, we review the legal question de novo. (*Ibid.*) So too where the material facts are largely not in dispute—as is the case for purposes of this issue on appeal—our review is de novo. (*Mountain Air Enterprises*, *LLC v. Sundowner Towers*, *LLC* (2017) 3 Cal.5th 744, 751 (*Mountain Air*) [reviewing award of attorney fees].)

In denying Ajaxo's motion to vacate or amend the judgment relative to the costs award, the trial court reasoned that it had "appropriately determined that E*Trade is the prevailing party with respect to the judgment . . . . The judgment resolves Ajaxo's cause of action for misappropriation of trade secrets, the only (remaining) cause of action in the case, and Ajaxo recovered no relief." The court granted Ajaxo's motion to tax costs only as to certain fees; it otherwise denied Ajaxo's motion to strike costs.

We find that whether this determination was error depends largely on the meaning of "action or proceeding" under Code of Civil Procedure section 1032, subdivision (b). The statute provides that except as otherwise ordered by statute, a "prevailing party is entitled as a matter of right to recover costs in *any action or proceeding*." (*Id*., § 1032, subd. (b), italics added.) " 'Prevailing party' " is defined to include "the party with a net monetary recovery" (*id*., § 1032, subd. (a)(4)), as claimed by Ajaxo, and "a defendant where neither plaintiff nor defendant obtains any relief" (*ibid*.), as claimed by E*Trade.

Ajaxo emphasizes that courts look at the action as a whole to decide whether a party obtains a net monetary recovery. "[T]he rule is that a partial recovery, as long as it is a net monetary recovery, entitles a plaintiff to costs." (*DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1157 (*DeSaulles*).) This establishes a "default rule" as to the party who obtains a net monetary recovery. (*Ibid.*) Ajaxo maintains that it falls under this default rule as the party who obtained a net monetary recovery, namely the $1.29 million in damages awarded for breach of the

77

nondisclosure agreement and affirmed in *Ajaxo I*. (*Ajaxo I*, *supra*, 135 Cal.App.4th at pp. 55, 57.) Ajaxo argues that although the trial court denied it any recovery in the reasonable royalty phase of the litigation, its position relative to E*Trade for purposes of the costs of suit is indistinguishable from that of a plaintiff who has received a partial recovery. (See *DeSaulles*, *supra*, at p. 1157, citing *Michell v. Olick* (1996) 49 Cal.App.4th 1194, 1199 [plaintiff entitled to costs for success on only one of 12 causes of action, for a jury award of $63,000].)

E*Trade responds that an "action" refers to a judicial proceeding *through judgment*, and the "judgment is the final determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577.) It does not dispute that Ajaxo obtained a net monetary recovery as far as its damages award on the breach of contract cause of action and 2003 judgment in its favor. But it argues that the 2003 judgment was "affirmed" in relevant part in *Ajaxo I* and became final after the 2006 remittitur and full satisfaction of that judgment, including costs under Code of Civil Procedure section 1032. It contends that it properly sought to recoup its allowable prejudgment costs (*id*., § 1034) incurred after the 2006 remittitur and before the 2015 judgment in its favor.[25] It argues that Ajaxo relies on inapposite authorities involving single-judgment

---

[25] Counsel for E*Trade explained these costs in his declaration in support of E*Trade's opposition to the motion to strike costs. According to that declaration, the 2003 judgment after the first jury trial and bench trial on injunctive relief became final in 2006, upon the Supreme Court's denial of review of the *Ajaxo I* decision and remittitur of the case. E*Trade paid the judgment in full, including the damages awarded by the jury for breach of contract, as well as the costs awarded to Ajaxo, interest, attorney fees, interest on fees and costs, and the further award of attorney fees on appeal in *Ajaxo I*. After the jury awarded Ajaxo nothing on its misappropriation claim in the 2008 jury trial (second trial), the trial court entered judgment in September 2008 for E*Trade, including costs. Ajaxo never sought to tax the items in E*Trade's 2008 memorandum of costs, though it argued in an unsuccessful motion to vacate the 2008 judgment that the court should not have awarded costs to E*Trade. E*Trade points out that Ajaxo did not challenge that ruling or the costs award in its appeal from the 2008 judgment in favor of (continued)

78

actions, whereas this dispute involves *two separate final judgments* between the same parties.

Ajaxo disagrees with E\*Trade's characterization of separate judgments as determinative. It contends that *DeSaulles* is instructive and controlling on the issue because it teaches that separate judgments entered at disparate times should not distract the court from determining the prevailing party based on the action as a whole.

We find merit in the arguments of both sides, as supported by the statutory language and case authority. But only E\*Trade squarely addresses the complication in this case of the separate final judgment, which was fully satisfied—including payment of attorney fees, costs, and interest—after the remittitur in 2006.

The court's primary goal in interpreting a statute "is to determine and give effect to the underlying purpose of the law." (*Goodman v. Lozano*, *supra*, 47 Cal.4th at p. 1332.) In doing so, we look to the words of the statute, giving them a plain and commonsense meaning, and "according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." (*Dyna-Med*, *Inc. v. Fair Employment & Housing Com*. (1987) 43 Cal.3d 1379, 1387 (*Dyna-Med*).) "The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Ibid*.)

Applying these principles of interpretation, we find that a party's entitlement to cost recovery as a matter of right under the statute is a dual proposition. The party must be a "[1] prevailing party . . . [2] in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) Both components must be accorded significance consistent with the legislative purpose. (*Dyna-Med*, *supra*, 43 Cal.3d at p. 1387.)

---

E\*Trade. Its memorandum of costs filed in relation to the 2015 judgment included costs filed after the 2008 jury trial on damages for misappropriation.

79

For purposes of this discussion, the meaning of "prevailing party" is supplied by the statute and is not actually in dispute. Either Ajaxo is the prevailing party, as "the party with a net monetary recovery" (Code Civ. Proc., § 1032, subd. (a)(4)), or E*Trade is the prevailing party, as "a defendant where neither plaintiff nor defendant obtains any relief" (*ibid*.). To determine which is correct requires us to interpret the second part of the statutory equation, the "action or proceeding." (*Id*., § 1032, subd. (b).)

On the one hand, Ajaxo's position on what it terms the action "as a whole" coheres with both the statutory definition of "action" and the common understanding of the legal term. By statute, "[a]n action is an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." (Code Civ. Proc., § 22.) Common understanding of the term moreover suggests a lawsuit or analogous proceeding in pursuit of a legal remedy. Indeed, the California Supreme Court recently examined the meaning of "action" in a case considering whether the assertion of an affirmative defense was an action or proceeding for purposes of a contractual attorney fees provision. (*Mountain Air*, *supra*, 3 Cal.5th 744.) It noted that an " 'action' " can be viewed as "synonymous with a lawsuit (see Code Civ. Proc., § 22) . . . ." (*Id*. at p. 753.) The court rejected the assertion of an affirmative defense as equal to or constituting an action, because "[e]ven though an action may refer to the 'entire judicial proceeding' [citation], this does not mean that each individual occurrence within this process is itself an 'action.' " (*Ibid*.) It explained that " 'courts generally treat the term "action," as defined by Code of Civil Procedure section 22, as referring to the *whole* of a lawsuit rather than to discrete proceedings within a lawsuit.' " (*Ibid*.)

Applying this understanding, we find that a "prevailing party . . . in any action or proceeding" (Code Civ. Proc., § 1032, subd. (b)) refers to the prevailing party in a lawsuit prosecuted by a party—in this case Ajaxo—for redress of a wrong. (*Id*., § 22; see *Mountain Air*, *supra*, 3 Cal.5th at p. 753; see also *People v. Yartz* (2005) 37 Cal.4th 529,

80

538 [" 'civil action' does not have a different meaning from 'civil suit' "].)  We agree in principle with Ajaxo that to say an earlier-filed judgment effectively severs an action in two, as E*Trade suggests, frustrates this understanding of an " 'action' " as " 'referring to the *whole* of a lawsuit rather than to discrete proceedings within a lawsuit." (*Mountain Air*, *supra*, 3 Cal.5th at p. 753.)[26]

On the other hand, the unusual posture of this case following the 2006 remittitur and full satisfaction of the judgment that was affirmed in *Ajaxo I* tests the limits of how inclusively we can define an "action" for purposes of mandatory cost recovery, when the lawsuit includes more than one final judgment with its own prevailing party determination and costs award.

As much as an " 'action' " may be "synonymous with a lawsuit (see Code Civ. Proc., § 22)" (*Mountain Air*, *supra*, 3 Cal.5th at p. 753), it is also generally understood to terminate at judgment.  (*Ibid.* [" 'action is not limited to the complaint but refers to the entire judicial proceeding at least through judgment' "] quoting *Nassif v. Municipal Court* (1989) 214 Cal.App.3d 1294, 1298.)  And "[a] judgment is the final determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577.)  The statutory right to costs under Code of Civil Procedure section 1032 arises as a function of this

---

[26] Such a "severing" function could also create endless problems for the appellate process as a contradiction of the " 'one final judgment' " rule, the "fundamental principle of appellate practice that prohibits review of intermediate rulings by appeal until final resolution of the case." (*Griset v. Fair Political Practices Comn.* (2001) 25 Cal.4th 688, 697; see Code Civ. Proc., § 904.1; *Knodel v. Knodel* (1975) 14 Cal.3d 752, 760.)  The rule was designed to prevent " 'piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and that a review of intermediate rulings should await the final disposition of the case.' " (*Griset*, *supra*, at p. 697.)

It does not escape our attention that the dilemma in assigning costs to the prevailing party here arises at least in part from the disposition of *Ajaxo I*, which reversed the judgment "[w]ith respect to the trial court's grant of nonsuit on damages for misappropriation of Ajaxo's trade secret" but affirmed the judgment "[i]n all other respects . . . ." (*Ajaxo I*, *supra*, 135 Cal.App.4th at p. 69.)

finality. (*Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 677 ["It is established that the right to costs is statutory and that costs 'are allowed solely as an incident of the judgment given upon the issues in the action.' "].) It is in other words the final determination of the rights of the parties (typically captured in the judgment terminating the action or proceeding (Code Civ. Proc., § 577)), that enables a court to ascertain the prevailing party. What is more, the filing of a satisfaction of judgment signifies "the last act and end of the proceedings." (*Brochier v. Brochier* (1941) 17 Cal.2d 822, 825.) It is, as E*Trade points out, decisive of the rights of the parties. (*Rancho Solano Master Assn. v. Amos & Andrews*, *Inc.* (2002) 97 Cal.App.4th 681, 688.)

Thus we confront a scenario where determination of the "prevailing party . . . in any action or proceeding" (Code Civ. Proc., § 1032, subd. (b)) refers to the entirety of the action between the parties; but the basis for the "prevailing party" status asserted by Ajaxo is the subject of an "action" that *already terminated at a final judgment* for which the defendant paid full satisfaction *including fees and costs*. To automatically extend the benefit of the "net monetary recovery" to subsequent phases which resulted in no recovery strikes us as contrary to the finality promised by the satisfaction of judgment. (See *Gray1 CPB*, *LLC v. SCC Acquisitions*, *Inc.* (2015) 233 Cal.App.4th 882, 891 [explaining time limit on motion for attorney fees related to effort to enforce a judgment " ' "is to avoid a situation where a judgment debtor has paid off the entirety of what he [justifiably] believes to be his obligation in the entire case, only to be confronted later with a motion for yet more fees" ' "].)

Nor does it fulfill the purpose of the cost recovery statutory scheme from a fairness standpoint. Cost recovery "as a matter of right" (Code Civ. Proc., § 1032, subd. (b)) has at its core the "basic purpose of imposing costs on the losing party . . . ." (*DeSaulles*, *supra*, 62 Cal.4th at p. 1152.) Ajaxo's theory of cost recovery would require the court to consider Ajaxo's success in the action as a whole while removing from consideration the fact that Ajaxo already recouped its " 'incidental damages' " for the

82

aspect of the action on which it prevailed. E*Trade likewise already paid those incidental costs based on Ajaxo's prevailing party status under the 2003 judgment. (See *id.* at p. 1147 [" ' "The theory upon which [costs] are allowed to a plaintiff is that the default of the defendant made it necessary to sue him; and to a defendant, that the plaintiff sued him without cause. Thus the party to blame pays costs to the party without fault." ' "].)

We are not convinced by Ajaxo's arguments to the contrary. Ajaxo seeks to analogize the procedural posture in this case to that in *DeSaulles*, claiming that separate judgments were entered there as well, yet the plaintiff was deemed the prevailing party because she had obtained an overall, net monetary recovery. We find that depiction only partially accurate.

*DeSaulles* arose from an employee's lawsuit against her employer in which she alleged seven causes of action. (*DeSaulles*, *supra*, 62 Cal.4th at p. 1145.) After the court ruled prior to trial that it would preclude five of the causes of action, the plaintiff entered a settlement for payment of $23,500 and dismissed the two causes of action that would have continued to trial; the court later entered an amended judgment in the defendant's favor as to all seven causes of action and deferred any ruling on costs until such time as the judgment would become final on appeal. (*Id.* at pp. 1145-1146.) The plaintiff's appeal was unsuccessful, and after remittitur both parties claimed to the trial court to be the prevailing party entitled to recovery of costs. (*Id.* at p. 1146.) The trial court awarded the defendant costs, and the Court of Appeal reversed, concluding that the plaintiff had obtained a net monetary recovery due to the settlement and was therefore the prevailing party. (*Ibid.*)

The California Supreme Court affirmed the decision of the Court of Appeal, reasoning that the statutory definition of " 'prevailing party' " as "a defendant in whose favor a dismissal is entered" (Code Civ. Proc., § 1032, subd. (a)(4)) "was not intended to encompass defendants that entered into a monetary settlement in exchange for dismissal." (*DeSaulles*, *supra*, 62 Cal.4th at pp. 1152-1153.) The court focused on the action as a

whole and concluded that the prevailing party definition at issue did "not apply to plaintiffs that have achieved some litigation success through settlement of the case" as opposed to "unsuccessful plaintiffs" seeking to evade the cost statute by dismissing their suit. (*Id*. at p. 1153.)

Ajaxo argues that *DeSaulles* stands for the proposition that when two judgments are entered and become final at disparate times, Code of Civil Procedure section 1032 requires only that the trial court look for a net monetary recovery, even partial or reduced from what the plaintiff sought. (*DeSaulles*, *supra*, 62 Cal.4th at p. 1157.) The glaring gap in any analogy between this case and *DeSaulles*, however, is that the dismissal of the two causes of action in consideration for a monetary settlement in *DeSaulles* did not result in a separate judgment, subsequently satisfied in full with an award of costs. To the contrary, the amended judgment entered by the court a year after the settlement noted that the parties had settled two causes of action and stated that the parties " 'shall defer seeking any recovery of costs and fees on this Judgment coming final after the time for all appeals.' " (*Id*. at p. 1146.) Thus, while Ajaxo is correct that *DeSaulles* considered all of the "action" to determine the plaintiff's "net monetary recovery" (Code Civ. Proc., § 1032, subd. (a)(4)), the case offers no discernable guidance on a net monetary recovery that fails to extend past the previous, final and fully satisfied judgment.

Ajaxo also argues that to award E*Trade its costs undermines the theory that " ' "the party to blame pays costs to the party without fault." ' " (*DeSaulles*, *supra*, 62 Cal.4th at p. 1147.) It contends that having obtained a jury verdict finding E*Trade guilty of willful and malicious misappropriation of the Ajaxo trade secret and holding E*Trade liable for $1.29 million in damages, it cannot be said that Ajaxo is anything but the aggrieved party. This is true only to a point. Ajaxo recovered all of its costs as the prevailing party under the 2003 judgment. In all subsequent proceedings in the action, Ajaxo failed to recover, and E*Trade successfully asserted its rights against paying further damages. (*Ibid*. [" 'Costs are allowances which are authorized to reimburse the

84

successful party to an action or proceeding and are in the nature of incidental damages to indemnify a party against the expense of successfully asserting his rights.' "].)

We recognize that in Ajaxo's view, the award of costs to E*Trade is incompatible with the outcome of the first trial and first two appeals. Considering, however, that Ajaxo recovered its costs from E*Trade for having asserted its rights up to the 2006 remittitur, and considering that since full satisfaction of that judgment Ajaxo has not recovered anything, we conclude the trial court correctly ascertained that Ajaxo did not recover a "net monetary recovery" in the action post-remittitur. This left E*Trade as a contender for recovering costs as a matter of right, as a "defendant where neither plaintiff nor defendant obtains any relief . . . ." (Code Civ. Proc., § 1032, subd. (a)(4).) Under the unique procedural circumstances presented here, the court did not commit legal error in deeming E*Trade the prevailing party in the action.[27]

## III. DISPOSITION

The judgment is affirmed, including the award of costs to E*Trade. E*Trade is entitled to its costs on appeal.

---

[27] E*Trade argues that to the extent we might find that Code of Civil Procedure section 1032 does not anticipate multiple final judgments between the same parties in the same civil case, and that both applications of "prevailing party" are true—each as to a separate judgment, then the prevailing party determination is "other than as specified" by the statute (Code Civ. Proc., § 1032, subd. (a)(4)), which in any event authorizes the trial court to determine the prevailing party and award costs. We believe that while the court could properly find E*Trade to be the prevailing party under the statutory definition supplied, as described above, this argument has merit as a possible alternative ground.

85

_____
Premo, J.

WE CONCUR:

_____
Greenwood, P.J.

_____
Grover, J.

Ajaxo, Inc. v. E*Trade Financial Corp.; Ajaxo, Inc. v. E*Trade Group, Inc.
H042999; H043530

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. CV793529 |
| --- | --- |
| Trial Judge: | Hon. Joseph Huber |
| Counsel for Plaintiff/Appellant: | Martin APC<br>Kevin R. Martin |
| Counsel for Defendant/Respondent: | Morgan, Lewis & Bockius<br>Joseph E. Floren<br>Christopher J. Banks<br>Deborah E. Quick |

Ajaxo, Inc. v. E*Trade Financial Corp.; Ajaxo, Inc. v. E*Trade Group, Inc.
H042999; H043530